## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BTIG, LLC,<br><br>       *Plaintiff*,<br><br>v.<br><br>DEBAYAN BHADURI,<br><br>       *Defendant*. | Case No:<br><br><br>**COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

J. Noah Hagey, Esq.
Christman Rice, Esq.
Kelsie Docherty, Esq.
**BRAUNHAGEY & BORDEN LLP**
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (646) 403-4089
hagey@braunhagey.com
rice@braunhagey.com
docherty@braunhagey.com

Jeffrey Theodore, Esq.*
**BRAUNHAGEY & BORDEN LLP**
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808
theodore@braunhagey.com
*Pro Hac Vice* application
forthcoming

*Attorneys for Plaintiff BTIG, LLC*

Plaintiff BTIG, LLC ("BTIG" or "Plaintiff") brings this Complaint against Defendant Debayan Bhaduri ("Bhaduri" or "Defendant") and alleges as follows:

## INTRODUCTION

1.      BTIG brings this action against a key perpetrator of one of the greatest financial-industry trade secret frauds in recent history. Defendant Bhaduri was recruited by senior executives of industry competitor StoneX to exfiltrate BTIG's software code and trade secrets, bring them to StoneX, and use them to build competing products and platforms that would have taken StoneX years to develop on its own. For over a month before resigning from BTIG, Bhaduri concealed from BTIG that he had already agreed to join StoneX while using the time to send himself sensitive BTIG plans, presentations, and design documents outlining BTIG digital trading products and services, take notes and photos of BTIG software code, and even set up a duplicate code server on his personal computer that he used to secretly exfiltrate BTIG code. Once at StoneX, Bhaduri incorporated BTIG's code and trade secrets to build new automated trading and market making tools. StoneX's senior executives, including Charles Lyon, John Rappaport, Thomas Moore, and Christopher Amato directed Bhaduri to do this because StoneX's lack of competitive automated trading tools was causing its stock to underperform, and StoneX wanted to be able to tell investors that it was ready to launch a new suite of automated trading products. Evidence from a neutral, third-party forensic evaluation of a small portion of the relevant code has now confirmed that proprietary BTIG code appears verbatim in StoneX's product code base.

2.      BTIG is a global financial services firm specializing in investment banking, institutional trading, research, and related brokerage services. Ten years ago, BTIG identified a market opportunity in program trading. Since then, BTIG, through its Global Portfolio and ETF Trading team ("GPT Group"), has invested countless millions of dollars and untold hundreds, if

not thousands, of hours to build a program trading solution that can value and price derivatives, deliver analytics, process orders, and execute large volume trades quickly, efficiently, and with minimal or no price impact. Through years of effort, BTIG has developed a suite of sophisticated, bespoke software programs, sophisticated trading algorithms, methodologies, functionalities, and reams of market information. By 2021, BTIG was one of very few firms able to satisfy the most demanding institutional trading needs reliably, quickly, and efficiently—and to profit accordingly.

3.      Defendant Bhaduri is an experienced software engineer and was employed as a director and managing director at BTIG from 2013 until 2021, when he abruptly left BTIG and joined StoneX at the behest of StoneX executives, including Amato, with whom he had worked at BTIG. At StoneX, Bhaduri joined a team of software engineers recruited primarily from BTIG and led by Amato with the assignment to build StoneX new trading and market making products using prior employer code.

4.      StoneX competes with BTIG and offers investment banking, institutional trading, research and related brokerage services. However, StoneX had failed to develop up-to-date digital trading solutions and lacked BTIG's sophisticated software solutions, algorithms, and treasure trove of proprietary information for pricing, trading, and executing orders on key financial instruments. StoneX lacked automated, digital products for market making, trading, and order execution business at the highest levels and, as of the third quarter of 2020, was suffering declining revenue capture in its equities business. StoneX's stock performance was suffering, and StoneX's earning calls reflected its desire to build out its technology and automate processes both in its existing business lines and so that it could expand into new lines of market making and trading business.

5.      But StoneX lacked the technological capabilities and personnel to accomplish these tasks. Even with experienced personnel, building and debugging a digital trading and market making system would have taken years. Accordingly, StoneX decided to recruit Bhaduri and a group of other BTIG software engineers—in knowing violation of the contractual obligations and restrictive covenants in their employment agreements with BTIG. Working at StoneX's direction, Bhaduri took BTIG's code and other IP and used it at StoneX to create previously non-existent automated digital trading products that would underlie StoneX's trading and market making business going forward.

6.      On January 5, 2021, StoneX sent Bhaduri employment on-boarding paperwork— demonstrating that Bhaduri had already accepted an offer of employment from StoneX prior to January 5, 2021, one month before his departure from BTIG. Bhaduri had been in discussions with StoneX for months before his resignation. A week earlier, on December 31, 2020, Bhaduri had emailed the restrictive covenant provisions in his BTIG Offer Letter to his personal email account so that he could forward them to StoneX for its review. But Bhaduri did not submit his resignation to BTIG until February 1, 2021—the day BTIG distributed its 2020 bonuses. Bhaduri's resignation was effective February 5, 2021, without providing the customary two-weeks' notice. Bhaduri refused to tell BTIG the identity of his new employer but assured BTIG that he would not be working in a similar job for a BTIG competitor. This representation was false. Instead, Bhaduri began to work for StoneX within 90 days of his resignation from BTIG, in contravention of the restrictive covenants in his employment agreement and his fiduciary duties to BTIG.

7.      In the interim period between his decision to work for StoneX and his resignation from BTIG, Bhaduri exfiltrated sensitive information from BTIG. Between December 5, 2020

and January 28, 2021, while he was discussing employment with StoneX and after he had agreed to employment with StoneX, Bhaduri sent at least 19 emails from his BTIG email account to his personal Gmail account containing BTIG's highly confidential, proprietary and trade secret information. Bhaduri sent some of the most sensitive emails and documents to his personal email account after he commenced the employment on-boarding process with StoneX on January 5, 2021.

8.      Bhaduri also took extraordinary steps to extract and exfiltrate BTIG's software code from BTIG's servers and repositories and transfer it to StoneX in ways that would evade BTIG's extensive security measures. Bhaduri duplicated a BTIG Perforce cloud-based code repository on his home computer and then used that same software at StoneX to incorporate the stolen code into StoneX products. Bhaduri also coordinated with Evan Pfeuffer, another BTIG engineer who was recruited to StoneX on the same date, to encrypt BTIG software code and appended the encrypted code to otherwise innocuous electronic materials such as publicly available PDFs, making it unrecognizable to BTIG's normal monitoring systems, and then used BTIG's customer reports system to exfiltrate the code-incorporating PDFs as email attachments.

9.      Bhaduri took extensive steps to hide his theft. Along with his co-conspirators, Bhaduri deleted log files or otherwise used administrative credentials to circumvent BTIG's monitoring and network security to conceal the transfer of code and other information. Bhaduri also took screenshots, photographs, and notes of computer screens containing BTIG code, documents, and other confidential and proprietary information to avoid tracing and detection.

10.      Bhaduri worked with others at StoneX to subsequently recruit three more former BTIG software engineers—Anthony V. Centrella, Jyoti Bhangale, and John Leung (together with

Bhaduri, Amato, and Pfeuffer, the "Disloyal Employees")—to steal further BTIG information and join a team at StoneX under Amato's management and direction.

11.     Once at StoneX, Bhaduri and the other Disloyal Employees used stolen code and proprietary information to create a new software platform, internally dubbed "Pascal," to undergird trading, market making, and other functions of a modern automated trading platform.

12.     Pascal operates across business lines at StoneX and is the cornerstone of the new suite of digital products offered by StoneX Group to both retail and institutional investors. Pascal is used for Equities, Derivatives/Futures, and Fixed Income trading. Pascal now forms the basis for nearly *all* StoneX products that automate market-making, algorithmic trading, trade execution, and order confirmation and settlement, including StoneX One and StoneX Pro. StoneX has also used Pascal to build and expand on at least the following business lines: Risk Management, Commodities, Execution Services, Self-Direct Services, and Capital Markets. Lyon touted Pascal at a March 2022 conference as the "internalizer of every asset class."

13.     StoneX executives including Amato, Lyon, Rappaport, and Moore were aware that Amato's team was building Pascal and StoneX's digital products on the basis of stolen code and IP. They gave specific instructions to use prior employer code because Lyon, Rappaport, and Moore wanted to be able to tell investors that StoneX had new digital trading products within months, and it would have been impossible to write, develop, test, and put into production the requisite code from scratch on anything less than a multi-year timeframe. In fact, the recruited BTIG employees would upload hundreds of code files and thousands of lines of code to StoneX's code repositories in a single night—volumes of code that would have taken *years* to write.

14.     Amato, Rappaport, and Moore were responsible for regular presentations and updates regarding the status and timeline of Pascal and the products being built with it to StoneX's Executive Committee, including Lyon. Those participating knew that the work was being done through mass use and incorporation of stolen code, including by Bhaduri.

15.     StoneX went to great lengths to hide its and Bhaduri's wrongdoing. For example, StoneX knew that Bhaduri and the other Disloyal Employees were acting in breach of their restrictive covenants with BTIG. In an effort to obscure that fact, Rappaport instructed that the team's organizational structure be nominally changed so that the other Disloyal Employees nominally did not report to him, though he in fact led their team, and that the positions of the Disloyal Employees be re-named to obscure the fact that they were competing with BTIG.

16.     Meanwhile, during a routine compliance review in February 2021, shortly following Pfeuffer's and Bhaduri's resignations, BTIG became aware of a small portion of the scheme when it identified Bhaduri's emails containing confidential information and sent to his personal email account. Seeking to protect its IP without litigation, BTIG reached out to StoneX and its counsel.

17.     Bhaduri, StoneX senior executives, and StoneX in-house counsel assured BTIG that the emails were an isolated matter and that StoneX had no desire to obtain the stolen information and assets. StoneX entered into an agreement with BTIG to have a third-party IT forensics firm scrub and delete from the former personnel's computer system and equipment any of the offending emails and documents or files that were contained in those emails, and confirmed that they and StoneX had deleted any and all of BTIG's proprietary information in their possession, and would not use any such information going forward. Pursuant to that agreement, StoneX also delivered sworn affirmations from Bhaduri and Pfeuffer with sworn

assurances that StoneX would segregate the emails and had not taken or used any other BTIG proprietary information. StoneX represented that Pfeuffer and Bhaduri "have not retained . . . any . . . BTIG Confidential Information" and have "not provided or disclosed, directly or indirectly . . . , any BTIG Confidential Information to any third-party (including, but not limited to [StoneX])." The agreement pursuant to which the sworn affirmations were delivered was negotiated and executed by StoneX Assistant General Counsel Craig L. Hymowitz, who was acting on behalf of StoneX, Amato, and his team. BTIG accepted and relied on StoneX's sworn assurances.

18.     However, those sworn representations were false. In 2023, a StoneX whistleblower who had worked alongside Bhaduri at StoneX publicly revealed that StoneX had incorporated BTIG's proprietary software code into Pascal and that the scheme had generated "millions of dollars" in just 18 months. The whistleblower revealed some of the mechanisms by which Bhaduri and his team had accomplished their theft from BTIG—including by encrypting thousands of pages of software code and other proprietary information, appending it to inconspicuous-looking PDF files, removing the PDFs from BTIG's systems, and then uploading them into StoneX's code repositories. The whistleblower *also* disclosed contemporaneous text messages between Bhaduri, Amato, and Pfeuffer just prior to Bhaduri's departure from BTIG in which Bhaduri stated "they will shut me down today so I have to make some notes, etc." and Pfeuffer observed that he was "robbing a bank" before he left. Amato instructed him "Sweet. Only take the 20s."

19.     Following the whistleblower's disclosure, BTIG once again contacted StoneX to attempt to address the matter without litigation. The parties then jointly hired an independent forensic expert, who, after comparing only *limited* portions of the parties' software, found dozens

of instances in which StoneX's code incorporated, verbatim, entire swathes of BTIG code—
including the inclusion of explicit references to BTIG and its personnel in the code underlying
*StoneX's* products. The expert concluded that his findings "cannot be explained in any way other
than copying." The expert also noted that he provided a conservative assessment that errs on the
side of false negatives, and that "the lines of code that [he] identif[ies] may not be all the code
that was copied." Following the expert's report, StoneX ceased all cooperation with BTIG.

20.    In this action, BTIG seeks to hold Bhaduri accountable for his role in one of the
most brazen IP heists in financial services history. Given the breadth of Bhaduri's involvement
stealing BTIG's proprietary trading software and other products, breaching contracts with BTIG,
the lengths Bhaduri went to cover his tracks, and the lies and deception that Bhaduri perpetrated,
the scope of Bhaduri's unjust enrichment is not presently known. BTIG accordingly seeks all
available equitable and legal remedies, including to prospectively enjoin Bhaduri from using any
of BTIG's confidential, proprietary or trade secret information in the future.

## PARTIES

21.    Plaintiff BTIG, LLC is a limited liability company organized and existing under
the laws of Delaware with its principal place of business located at 600 Montgomery Street, 6th
Floor, San Francisco, CA.

22.    Defendant Debayan Bhaduri is a natural person residing in Mahwah, NJ, and
works for StoneX at its offices at 230 Park Avenue, 10th Floor, New York, NY 10169.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to
28 U.S.C. §§ 1331, 1332. This Court has supplemental jurisdiction over Plaintiff's claims
pursuant to 28 U.S.C. § 1367.

24.     This Court has personal jurisdiction over Defendant because Defendant works within the Southern District of New York. Venue is proper in this district under 28 U.S.C. § 1391 because a "substantial part of the events or omissions" on which Plaintiff's claims are based occurred in this district—including at StoneX's office in Manhattan.

## FACTS

### A.     BTIG and Its Industry Leading Trading Software and Platforms

25.     BTIG is a global financial services firm based in San Francisco specializing in investment banking, institutional trading, research, and related brokerage services.

26.     Approximately ten years ago, BTIG recognized an opportunity in the program trading space relating to the rise of certain financial derivatives called "Exchange Traded Funds" or "ETFs."  Correctly betting on growth in ETF trading, BTIG devoted significant time and resources to build a suite of software systems to provide bespoke, automated trading and order execution for ETFs and other derivatives to service large, sophisticated institutional clients. BTIG can value and price these derivatives and other securities, deliver analytics/market intelligence, process orders, and execute large volume trades quickly, efficiently, and with minimal to no price impact—rapidly handling large trading volumes for institutional clients better than others in the market. By 2021, BTIG was one of at most a handful of trading firms able to satisfy the most demanding institutional trading needs reliably, quickly, and efficiently – and to earn profits accordingly.

27.     As a result, BTIG's GPT Group operates a highly successful and lucrative portfolio and ETF trading business that provides pre-trade analytics, order execution, settlement and post-trade reporting to institutional investors. The GPT Group trades and fulfills orders for American Depositary Receipts ("ADRs"), Flexible Exchange ("FLEX") Options, ETFs, and many other financial instruments efficiently and cost effectively.

28.     To operate its business, BTIG has built an array of in-house, bespoke software applications as well as other proprietary and confidential structures and systems. BTIG's proprietary software, programs, and systems give BTIG a significant market and economic edge, allowing it to out-compete others in the market and obtain market-beating returns. In particular, the GPT Group's unique investments in systems, technologies, and technologists allow BTIG to process high volumes of trades more efficiently and compete with much larger financial institutions with significantly more personnel and capital than BTIG.

29.     BTIG's bespoke, proprietary software and applications include systems for ADR, ETF, foreign exchange, options, and portfolio trading, tools for enhancing and enriching trading data, analytics, reporting tools, and algorithms to provide customized products to portfolio trading clients.

30.     BTIG built each of these software systems through a joint effort of the sales and trading team, GPT Group software developers, and BTIG's system and network architect team. All of these proprietary applications and systems are extremely valuable to BTIG's business and would be just as, if not more, valuable to a competitor, particularly because they can also be utilized for market-making purposes.

31.     BTIG implements extensive measures to safeguard its trade secrets and proprietary information, including physical and software security measures, written policies and procedures, and comprehensive contractual arrangements with employees and other personnel, which were in place during the 2020-2021 time period and meet and exceed the industry standard for protecting highly valuable trade secrets and proprietary information.

32.     BTIG also implements firewalls and other network security measures, such as blocking access to non-BTIG webmail, cloud storage sites, chat and communication websites,

FTPs and SFTPs; requiring full VPN use on corporate laptops; implementing security software controlled single sign-on (SSO) with conditional access policies for access to applications; requiring use of cloud computing workspace for employees working on personal devices; and restricting server console access to a small group of employees with administrative credentials for whom such access was necessary to perform their duties.

**B.    Defendant Debayan Bhaduri Works for BTIG and Agrees to Preserve and Not Misappropriate BTIG's Confidential Information**

33.    Debayan Bhaduri is an experienced software engineer. Bhaduri joined BTIG as a Director in its GPT Group, effective September 30, 2013., and was promoted to Managing Director in January 2019. At BTIG, Bhaduri was centrally involved in every aspect of BTIG's portfolio trading desk. Bhaduri helped develop proprietary code applications for BTIG's quantitative trading platforms and for BTIG's GPT Group. Bhaduri also worked with the group's leadership to connect the business logic that Pfeuffer developed with the requisite market access processes and external sources.

34.    As part of his role, Bhaduri was granted administrative credentials for BTIG's operating systems and servers, which was reserved for a select few trusted administrators for whom such elevated and privileged access was necessary for the performance of their duties.

35.    Bhaduri's employment agreement, memorialized in a counter-signed offer letter, dated August 22, 2013, included detailed provisions requiring him to protect BTIG's confidential information:

- "(11)  <u>Confidential Information</u>. In working with BTIG, you will have access to and may become acquainted with business plans, strategies, financial data, trade secrets, customer lists, contracts, intellectual property, and other confidential and/or proprietary information and materials of BTIG and its clients or other third parties ("Confidential Information"). You agree that, at all times, you will hold and maintain such Confidential Information in confidence. You agree that, during and after your employment with BTIG, you will not (i) disclose or make available any Confidential Information to any person who is not authorized by BTIG to

receive such Confidential Information, or (ii) use any Confidential Information for any purpose other than that which is authorized by BTIG."

- "(12)  <u>Return of Documents and Other Property</u>. At any time upon our request, and when you leave your employment with BTIG, you are required and agree to deliver to BTIG, and not keep in your possession, copy, recreate, or deliver to any other person or entity, (i) all documents and materials containing any Confidential Information, whether such documents and materials were furnished to you by BTIG or one of its clients or were created by you, including all copies of such documents and materials, and whether in "hard copy" or in any electronically-stored format, and (ii) any and all other property that belongs to BTIG or that belongs to any other third party and is in your possession as a result of your employment with BTIG, whether created by you or another party."

- "(13)(b)  <u>Restrictive Covenants</u>. You agree that, for the period of three (3) months immediately following the termination of your employment with BTIG for any reason (other than a layoff due to structuring), you will not, directly or indirectly, within a fifty (50) mile radius of the New York Metropolitan Area, work for, be a consultant for, be employed by, or provide strategic advice to, any person, corporation, firm, or other entity engaged in a business that competes with the work of BTIG."

- "(13)(c)  <u>Restrictive Covenants</u>. During your employment with BTIG, and for the period of one (1) year after your last day of employment, irrespective of the reason your employment terminates or who initiates that termination, you agree that you will not, directly or indirectly, (i) solicit or otherwise induce or attempt to induce any employee of BTIG to end his or her employment with BTIG, or in any way interfere with the relationship between BTIG and its employees, (ii) solicit for employment or hire any employee of BTIG (or any individual who was an employee of BTIG during the six (6) month period before your last day of employment) to work for (as an employee, consultant, or otherwise) any business in competition with BTIG (provided that this restriction does <u>not</u> apply to clients of BTIG with whom you had a similar business relationship prior to your employment by BTIG), or otherwise induce or attempt to induce any client of BTIG to stop doing business with BTIG, or in any way interfere with the relationship between BTIG and any of its clients, investors, or vendors."

- "(13)(d)  <u>Restrictive Covenants</u>. You acknowledge and agree that your skills and position with BTIG are unique and that any breach of the provisions of this Section will cause irreparable harm. You further acknowledge and agree that the restrictions imposed by this Section are reasonable and are required for the protection of BTIG, and will not preclude you from becoming gainfully employed if and when your employment with BTIG ends."

36.     Bhaduri signed the offer letter and initialed every page of the offer letter.

37.     The BTIG Employee Manual contains similar obligations. In the Code of Conduct section, the list of "prohibited conduct" includes "[g]iving confidential or proprietary Firm information to competitors or other organizations, or to unauthorized Firm employees" and "[w]orking for a competing business while an employee of the Firm."

38.     The Employee Manual's section on Confidentiality provides that it is BTIG's "policy to ensure that the confidential, proprietary or trade secret operations, activities and business affairs of the Firm," including BTIG "financial records; reports; business plans and strategies; marketing materials; client names, accounts, identification materials; vendors; suppliers; trade secrets; inventions, programs, formulas, techniques and processes; and documents regarding confidential Firm operations," "must be handled in strict confidence."

39.     The Confidentiality policy continues that "[d]ocuments that [employees] create, receive or maintain both inside and outside of the office, whether in electronic form or hard copy, having to do with confidential, proprietary or trade secret information are the property of the firm," employees "are required to keep such data or information confidential unless disclosure is properly authorized and/or necessary for business purposes," "[n]o confidential, proprietary or trade secret Firm documents or property may be removed from its premises without prior authorization," and that "[u]pon termination of employment, all the Firm's documents and property in [former employees'] possession including any information in hard copy or electronic form must be returned to the firm."

40.     Bhaduri acknowledged the BTIG Employee Manual on February 6, 2017, May 24, 2018, June 26, 2019, and July 10, 2020.

41.     At BTIG, Bhaduri worked closely with the other five Disloyal employees.

42.     Amato led BTIG's ADR Conversion desk, which executed ADRs in 40+ markets worldwide, utilizing BTIG's proprietary trading strategies and technology. Amato's group executed both traditional ADRs and "reverse" ADRs, in which BTIG trades ADRs in the U.S. and settled in its foreign client's currency. Amato sought to create a new and improved ADR trading application for BTIG. The GPT Group agreed to lend their software engineering team to Amato and his ADR trading group to work on the project, including Bhaduri, Pfeuffer and their team members resulting in a trading program that became a core part of the ADR Conversion business.

43.     Pfeuffer had joined BTIG as a Managing Director in BTIG's GPT Group in May 2015. Pfeuffer played a central role in the creation of the software systems and other proprietary information and trade secrets used by BTIG's GPT Group and other groups. Pfeuffer's duties while employed at BTIG included (i) developing proprietary code applications related to BTIG's quantitative trading platforms and related functionality related to BTIG's GPT Group by converting the business logic and vision of the group's leadership into software code and applications, and (ii) overseeing the GPT development group and establishing best practices on how to develop, implement and secure the code and other proprietary information that he and others were creating for BTIG.

44.     Anthony V. Centrella was hired as a Director in BTIG's GPT Group, effective on or around December 16, 2019. Centrella worked with Bhaduri and Pfeuffer and assisted them with the development of the user interface ("UI") portions of BTIG's software, and with the development and refinement of numerous of BTIG's proprietary applications.

45.     Jyoti Bhangale was hired as a Director in BTIG's GPT Group, effective January 6, 2020. At BTIG, Bhangale was a Java developer who assisted Bhaduri and Pfeuffer with front-end development for BTIG's applications, including BTIG's proprietary and bespoke systems.

46.     John Leung was hired as a Director in BTIG's GPT Group, effective November 29, 2019. Leung functionally reported to Pfeuffer and Bhaduri and assisted them in developing the proprietary code applications related to BTIG's quantitative trading platforms and related functionality for BTIG's GPT Group.

**C.     StoneX Recruits Bhaduri and Tasks Him with Stealing BTIG's Intellectual Property**

47.     StoneX is a competing offeror of investment banking, institutional trading, research and related brokerage services. But as of late-2020, StoneX had failed to develop modern automated, digital trading and market making products. In particular, StoneX had failed to identify the emerging opportunity in program trading and found itself a decade behind. StoneX lacked BTIG's sophisticated software solutions, algorithms, and treasure trove of proprietary information for pricing, trading, and executing orders on key financial instruments, including portfolio basket trades, options, at-risk exchange trade funds (at-risk ETFs), execution of foreign exchange orders, and the others described above. As a result, StoneX could not compete for market making, trading, and order execution business at the highest levels and, as of the third quarter of 2020, was suffering declining revenue capture in its equities business.

48.     StoneX's earning calls from this time period reflect the internal concern that it was not operating as a "best in class financial platform connecting clients to markets across asset classes and offering vertically integrated execution and clearing" because of its digital deficiencies. StoneX told investors it was "relentlessly pursuing" certain objectives to reach this goal, including by "increasing digitization . . . by investing in client-facing technology" to make

"proprietary and industry standard platforms to better leverage our intellectual capital in driving revenue growth."

> 1. **StoneX Recruits Bhaduri in Violation of his Employment Agreements and Directs Him to Steal BTIG's Intellectual Property**

49.     StoneX Group Executive Vice President Charles Lyon (later promoted to CEO of StoneX Financial) spearheaded the effort to create automated trading platforms. But StoneX and Lyon knew that StoneX lacked the existing codebase, expertise, and qualified personnel required to build such products. Moreover, building automated trading platforms from scratch would take many years, whereas StoneX wanted to tell investors that they had an operational digital trading platform within months. Accordingly, Lyon and StoneX decided to steal the necessary technology.

50.     Lyon was close friends with Amato and had been Amato's intern at a prior employer. The two agreed that Amato would join StoneX to head up a new team, consisting of engineers that he would recruit from BTIG to steal BTIG's software and trade secrets and bring them to StoneX.

51.     Amato formally joined StoneX as Managing Director of Principal Equities Development with a start date of December 8, 2020. However, even in the months before that, Amato had been recruiting Pfeuffer and Bhaduri to leave BTIG and join his team at StoneX. Since the fall of 2020, Amato, Lyon, Rappaport and Moore had engaged in a full-court press to recruit Pfeuffer and Bhaduri to StoneX.

52.     On December 31, 2020, Bhaduri emailed the restrictive covenant provisions in his BTIG Offer Letter to his personal email account. Then, on January 5, 2021, StoneX sent Bhaduri employment on-boarding paperwork—demonstrating that Bhaduri had already accepted an offer of employment from StoneX prior to January 5, 2021. However, Bhaduri did not tell BTIG that

he intended to leave until the next month. Pfeuffer similarly accepted his offer well before he informed BTIG of his intent to leave.

53.     On February 1, 2021, the day bonuses were distributed to BTIG employees for the 2020 calendar year, Bhaduri and Pfeuffer informed BTIG that they were leaving as of February 5, 2021, without providing the customary two-weeks' notice. Bhaduri and Pfeuffer refused to say where they were going but falsely assured BTIG that it would not be a competitor.

54.     Bhaduri refused to tell BTIG the identity of his new employer but assured BTIG that he would not be working in a similar job for a BTIG competitor. This representation was false, and Bhaduri and Pfeuffer began to work for StoneX on February 8, 2021, well within 90 days of their resignation from BTIG, in contravention of the restrictive covenants in their employment agreements and their fiduciary duties to BTIG.

55.     In fact, as described above, Bhaduri had been in discussions with StoneX for months before his resignation. During this period, Bhaduri removed BTIG's confidential and proprietary information and trade secrets so that he could take them with him to StoneX, including by taking screenshots and digital photographs of certain BTIG confidential and proprietary information, and he brought those images with him to StoneX to aid the scheme.

56.     Bhaduri also sent the following to his personal email account from his BTIG email account:

        a.  On December 13, 2020, Bhaduri forwarded a list of strategic action items for BTIG's proprietary systems, which he was developing with BTIG colleagues. The list identifies planned development work on core functionalities of the system.

b.  On December 24, 2020, Bhaduri forwarded an email containing confidential discussions regarding an over-the-counter (OTC) security algorithm that BTIG was developing for a BTIG client. This information is highly confidential and would be valuable to any business developing similar OTC strategies.

c.  On December 28, 2020, Bhaduri forwarded a "Synopsis" document providing a comprehensive outline of a proprietary trading platform on which Bhaduri worked closely while employed by BTIG. Among other things, this document describes BTIG's proprietary software trading and order execution business lines. It includes descriptions of core services, business components, and processors, and the business framework of the core functionality. Additionally, this document details the existing architecture and future architecture under development for the planned services. A BTIG competitor that obtained this Synopsis would have a roadmap of BTIG's business strategy in developing this proprietary trading platform.

d.  On December 30, 2020, Bhaduri forwarded an updated version 2 of the "Synopsis" document described above.

e.  On December 30, 2020, Bhaduri sent a list of internal discussion points regarding BITG's proprietary system described in the "Synopsis" document described above.

f.  On January 2, 2021, Bhaduri forwarded an updated version 3 of the "Synopsis" document described above.

g. On January 4, 2021, Bhaduri forwarded a short form version of the "Synopsis" document described above, containing the key confidential information.

h. On January 26, 2021, Bhaduri forwarded a presentation deck describing the new platform described in the "Synopsis" document described above, including strategy on product development, marketing and sales reporting.

i. On January 27, 2021, Bhaduri forwarded an open source code "build list," which lists all the third party libraries installed in the BTIG production environment. BTIG's development environment utilized proprietary code for core functionality and third party software for commoditized processes. Basically, this is a map of third party vetted software that BTIG uses for all its processes.

j. On January 28, 2021, Bhaduri forwarded three Excel spreadsheets, prepared by another BTIG employee, specifying the identity of the securities BTIG was analyzing, which is confidential.

57. At the time, BTIG had not yet uncovered these emails. Accordingly, on February 5, 2021, BTIG provided Bhaduri with its standard "Guide to Leaving BTIG." Among other things, the Guide reiterated and reinforced Bhaduri's post-employment obligations to BTIG: "You are required to abide by the terms outlined in your employment letter or most recent official document regarding non-compete/non-solicit/non-poaching ('restrictive covenants'). Failure to do so may lead to legal action."

58.     Bhaduri nevertheless went to work for StoneX in violation of the restrictive covenant in his employment agreement and his duties to maintain the integrity of BTIG's proprietary information.

59.     Between Bhaduri's hire date on October 7, 2013 and his termination date on February 5, 2021, BTIG paid Bhaduri significant compensation.

60.     Bhaduri is now a Managing Director, Head of Quantitative Strategies at StoneX. His duties include working with the Principal Equities Development team to develop software and algorithms to be used by as part of his efforts to launch an NMS Market Making team.

### 2.     StoneX Recruits *Additional* BTIG Engineers, Expanding the Scheme to Steal BTIG's Intellectual Property

61.     Subsequently, Bhaduri, Amato, and Pfeuffer recruited three additional employees from BTIG to join Amato's team at StoneX: Centrella, Leung, and Bhangale.

62.     All of the Disloyal Employees worked at Amato's direction on the newly formed StoneX Principal Equities Development Team, developing software and algorithms to be used by StoneX's trading and market making teams.

63.     In particular, Bhaduri and the other members of Amato's new team was responsible for developing Pascal, source code for StoneX's national automated market making system.  Pascal was central to StoneX's efforts to efforts to digitize and develop automated, client-facing trading products, and to increase StoneX's profits by becoming the "internalizer of every asset class."  Today, Pascal forms the basis for nearly *all* StoneX products that automate market-making, algorithmic trading, trade execution, and order confirmation and settlement, including StoneX One and StoneX Pro.  StoneX has also used Pascal to build and expand on at least the following business lines: Risk Management, Commodities, Execution Services, Self-Direct Services, and Capital Markets.

64.     Amato was responsible for ensuring that his team delivered the necessary products and was compensated based on his and his team's performance.

65.     Amato reported to Thomas Moore (known internally as "T-Mo"), StoneX's Head of Equity Trading and Jake Rappaport, StoneX's Global Head of Equities. Rappaport in turn reported directly to Lyon. However, reflecting the team's importance and centrality to StoneX's overall business strategy, Amato *de facto* reported directly to Lyon.  Further, Rappaport, with Lyon's participation, made presentations about the team's work to StoneX's Executive Committee.

66.     At Rappaport's direction, Amato and StoneX selected a team name and titles purposefully curated so that they didn't seem like the type of positions that would be competitive with BTIG. In particular, the Disloyal Employees were termed "principal equities developers," over the objections of the software engineers, who were creating entire trading products, not just serving as software developers. This was done in an effort to hide the fact that the team was in violation of their restrictive covenants to BTIG.

67.     Also at Rappaport's direction, Amato was not listed as a manager of the other Disloyal Employees in an effort to hide the fact that he had recruited them in violation of his non-solicit agreement with BTIG. In actuality, Amato managed the entire group of former BTIG software engineers. They worked under Amato's direction, and he was responsible for and presented their work to StoneX management. Rappaport told the team this too was done to obscure the fact that the former BTIG employees were violating their agreements with BTIG and developing competing products. Once the time on Amato's non-solicit agreement had run, StoneX revised its org charts to reflect that he was, in fact, the leader of the team.



### D.     Bhaduri and the Disloyal Employees Steal BTIG's Proprietary Information

68.     Amato and StoneX have encouraged Bhaduri and the other Disloyal Employees to steal BTIG's proprietary information. During an in-person meeting with Amato and Bhaduri before they were hired, Lyon, Rappaport and Amato explicitly encouraged that Pfeuffer and Bhaduri bring intellectual property from their prior employers to BTIG.

69.     Bhaduri and the Disloyal Employees took StoneX's directive to heart and took extensive steps to exfiltrate proprietary, trade secret information from BTIG and incorporate it into StoneX's systems and products. Subsequent forensic review has revealed that they took extraordinary measures to evade BTIG's security measures and monitoring systems in order to exfiltrate and steal BTIG code.

70.     In the days leading up to Pfeuffer and Bhaduri's departure from BTIG, Bhaduri, Amato, and Pfeuffer bragged about their theft in a group text titled "stone."  On February 2, 2021, Bhaduri noted that "they will shut me down today so I have to make some notes etc." The

same day, Pfeuffer alerted the group that he'd informed BTIG of his resignation and stated that

he was "robbing a bank" before getting his fingerprints taken for his StoneX background check.

Amato responded: "Sweet. Only take the $20s."

71.     An independent expert review has identified that proprietary BTIG code appears

verbatim in StoneX's operational software code, including explicit references to BTIG and

BTIG's Managing Director of Technology. That expert concluded that at least 39 sets of code in

the Stone X code were line-by-line identical to the code from BTIG and "cannot be explained in

any way other than copying." Further, the expert noted that "the lines of code [he] identif[ied]

may not be all the code that was copied."

72.     Bhaduri accomplished this theft in multiple ways, the full scope of which is yet to

be uncovered.

73.     Bhaduri sent multiple emails to himself shortly before his departure from BTIG,

indicating that he had created a duplicate BTIG code environment on his home computer using a

Perforce cloud-based code repository and that he was attempting to delete information and user

accounts from either or both BTIG's and his own Perforce repository, likely to coverup his

exfiltration of BTIG code using Perforce.

74.     On January 27, 2021, Bhaduri sent an email from his BTIG email to his personal

email account that contained a BTIG build script. That build script would allow him to

immediately replicate BTIG's build environment and access all third-party libraries that were

used by BTIG.

75.     In the month after he had agreed to join StoneX and immediately prior to his

departure from BTIG, Bhaduri, under Amato's direction, also exfiltrated compressed data off of

BTIG's development servers in order to steal BTIG's software code. Bhaduri extracted

compressed files containing BTIG code from dedicated BTIG servers by exploiting the administrative privileges and high level of access with which he was trusted. To help clean up his tracks, on January 12, 2021, Bhaduri sent from his BTIG email to his personal email a command line that would enable him to remove the exfiltrated files from his personal devices after depositing them at StoneX.

76.     Bhaduri also conspired with Pfeuffer to steal additional code. On January 14, 2021, two weeks before resigning from BTIG, Pfeuffer texted with the whistleblower that "im' [sic] organizing code for our new venture….i'm getting svn set up on nmy [sic] machine." SVN refers to Apache Subversion, a software repository for storing and maintaining source code. Pfeuffer's text messages reflect that he was installing this repository on a computer outside of BTIG's systems and environments. Pfeuffer uploaded and transferred code from BTIG's network to a personal cloud-based Apache Subversion ("svn") repository so that he could later transfer it to StoneX.

77.     To avoid detection, Pfeuffer took large swathes of code and other proprietary information and encrypted them using NSA-level encryption techniques, rendering the payload a meaningless string of gobbledygook to anyone without the two-step encryption key. Pfeuffer then appended the encrypted code to PDF versions of generic documents that were downloaded from the internet; anyone looking at the files would see a generic PDF document that when opened presented itself as normal, but in fact had code and other information secretly encrypted and appended inside. Pfeuffer then used BTIG's automated email server for sending client reports to email the PDFs – with the encrypted code appended – to himself, and then he took the code through various means outside BTIG. Once outside BTIG, Pfeuffer could take out the encrypted code, decrypt it, transfer it to StoneX and then use it at StoneX.

78.     Pictured below are screenshots showing examples (BTIG has evidence of multiple encrypted payloads using different public documents to hide the theft) of how Pfeuffer hid encrypted payloads in what appeared to be public and unremarkable PDF files. The PDF file below, titled Effective Modern C++, contains a publicly available textbook on coding.  Pictured on the left below are the first and last pages of the original PDF file when opened in Adobe Acrobat. Pictured on the right is the version that Pfeuffer altered to append hidden payload containing BTIG code when opened in Adobe Acrobat. As seen below, when opened in Adobe Acrobat the altered and unaltered files appear to be identical.



79.     Only when these same two files are opened as binary text files such that the underlying code of the documents are visible does the hidden, encrypted payload in the version of the PDF that Pfeuffer altered become visible. The left-hand side of the screenshot below

shows the end of the original, unaltered PDF file, culminating in a line of code designating the file size followed by a line of code designating the end of the file ("EOF"). The right-hand side of the screenshot below shows the additional appended, encrypted payload that appears after the EOF marker and continues on for hundreds of pages.  The payload is compressed and encrypted and so it cannot be extracted or deciphered without the decryption key, but based on the evidence and BTIG's investigation, the payload likely represents hundreds or thousands of pages of BTIG software code.



page 2174

'££ôo×Đđ×k.Ê?vN¶È×ũ¾;ƒz5ô«
ŧ#œ-4³P4P⁴Í±F¹£ôëtÝ£ú¸¶×kïu¸.¸¥W
F5,æ£bÏæ#ÐⱤ§Qùɪ¶MCÞÁʗⁱⁿ⁶ɴÈÖ¹ïô©f¸_P⁵¶ÐⱢ£©ⁿÖzÐ¶Ö¶Ð¶ïÖ¶ïô}©{ɥ×£ü#ÙÖⁿ²˳⁄ⁿˤ˵.öÑɡl.ꟻ-#ꟺⱧ₺#ŝœ
æWÚ.=(C¸fů}jᵁⅤᵛⱽ:£#%}ⁿw,£Áꟾ#¦ù
ŭ¹yCA¸ꟶ'U=Õꟾ¹ŵ#Ⱦ¦Ⓩ'£ᵢ%.Àæ#Öꟾ'$pⁿyⱫ.=ÖⱣⱮˣⱼý¸uÁꟾ-h
Ŏ#⁴Ɠ#ꟺⁱⁿ¸ǂ¶ⅡÀꟾ¤ⁿ#Öⁿ#ꟺꟾᵗ'Ūu¸_Åö¶ꟾⁱ¹.ⁿₓₓ¸£ⁿ¹ꟾ⁻¹⁷
=±¹³Ⓢ{ꞓⁿ#ÖⱱꟾÆⁿ
œ⁶¬ⁿⁿ£CⅥ¹ı¸#=øÖ¥#Ⱥ{#ⁿ=ÏÖÆⱥⱲⱨⱲ±¬¢Ɽ{¤ıꞘ#Ꞙꟼ'ȺⱳⱳⱳꞘ¸⁵ⱥⱳꟽⱲⱥ⁶:£:⁻·¹⁶±ȿ¬⁻äÅꞛð¸Ô¹'⁶£,∼⁴¹⁶Ɽ˥}Cₘ˥ỿⁿⁱꝋ
ŷ{còŧ$ⱼfyÅ∂¬#Å±Ð¥ⱮⱣ±.ₘ±ⱬᵗⱼ₁⁷#{}Cꞛ¹¶·Áⱦ}':
«{⁶ŧÐⱱⱬ'ꝊⱠⱬŭⱬ⁴&¬'Åⱥⱥⱦ={ₘⱽⱽⱧÖ¶ⱬⁿⱶ¤#ȺꞗⱱÔ±ⱼ'ₘ·#+³#ᵛⱱ
Ꙍ⁶²ÑÅⱤ'ꙍₑₗⁿ=¹⁶ÐⱵÖȺ⁶⁶'§'²£Ðⱷⱶⱪ:=·§Ⓢ₅Ⱨⁿ⁷ꟾⱦⱥ
0007274851  00000 =
0007272459  00000 =
0007274803  00000 =
0007274723  00000 =
0007271788  00000 =
0007274830  00000 =
0007274522
ƟⱧⱧⱪ⁴Ö⁴ⱳⱨÖ⁴ₐ⁴ⱨⱳⱧⱣⱠ{×Ð¶ₕⱥₕⱥⱭₐ¹ⱣⱢ±ꞱⱲ⁶ɜⱥⁿⱦ⁶≈₆{£¶Ʇͥ⁶ₓⱳⱤℓ⁶⁶'ÍⱰⱪⱦ⁴ÅₑⱤ⁴Å⁴ⱲⁿⱨⱬⱲⱠ#Ð#
ⱶ°±Å£ꞁⱣⱣ°ₕⱳ©.=⁶ⱼÏₓₓₘ¬⁵ʰⁱⱬ'ÓⱨⱣ'ꙙⱲⱤ
N ¶ⱤⱸⱵⱺⱦ¬{ⱼₗⱳ°ⱰꝊƧⱪꙍₑₗꙌ#ⱮⱲꞗⱶ⁴=Öⱳₑⱷⁿ±Öꞑꞁ"ₗⱥꞛ£ⱫⱳⱭ#ΐÅ#ⱥⱳⁿⱬ6
£ⱨₘⱶꞘ"Ôⱳ⁴ꞛ'ÖⱬꞑⱬꞗⱬⱪꝊⱳⱦꞑⱨꞑᵗ¬ꙍꞑꞗⱳ⁴ⱪ⁶=ⱳⁿꙍⱥ{.=¹¹·ÖⱬꝒ'ⱲⱪⱭ
ÐꞑⱨꙌⱞ£ꙉ⁶¢'ÖⱳⱤ'ⱣⱬⱣⱶⱷ⁴'ꙌⱷⱤ'Ꙍⱺⱬⱬⱬⱳⱳⱦ⁶¹=ⱦ⁸ⱤⱮ⁶=ⱬ¹°Ꝋ¸ꞝꝊₑⱤ⁶=Öꙍ
ⓏⱺꝊ±Öⱽⱷ⁶=⁶⁶⁶ÅⱳⁿₓꝊ#⁴ⁿⱥ·¹⁶⁶ⱼꙍⱥⱨ.=⁶ⱬꙌⱞ£Ᵽⱞⱼⱡꙍ£¹ꞿ·:ⱬꙍₑⱳ₆#°Öⱞ:ⱮⱤ⁶¶'¶=°ⱪⱬⱶⱥⱞⱥⱳⱬꝊₑ·Ⱶ·}ŭⱞ⁶£ₗ:Öⱳ'⁶ⱶⱥꝊⱶ¬£'ⱲꙍꙌ'Ⱦ¹ₑⱤ'Ⓩ¹
'ⓏⱷⱠⱶⱼꟾꝒⱼⱬ⁶={ⱥⱪⱦⱣꝊ⁴ꞗⱷ₆⁶⁶ⱥ⁶ⱤⱳⱼÞⱪⱼ§±ₓⱼⱬⱽꙉⱳⱪⱬⱳ
"ꞀⱥÑÖⱬÏ'Ꞹꞁ⁶Ꞁ·¹
'££ôo×Đđ×k.Ê?vN¶È×ũ¾;ƒz5ô«
ŧ#œ-4³P4P⁴Í±F¹£ôëtÝ£ú¸¶×kïu¸.¸¥W
F5,æ£bÏæ#ÐⱤ§Qùɪ¶MCÞÁʗⁱⁿ⁶ɴÈÖ¹ïô©f¸_P⁵¶ÐⱢ£©ⁿÖzÐ¶Ö¶Ð¶ïÖ¶ïô}©{ɥ×£ü#ÙÖⁿ²˳⁄ⁿˤ˵.öÑɡl.ꟻ-#ꟺⱧ₺#ŝœ
æWÚ.=(C¸fů}jᵁⅤᵛⱽ:£#%}ⁿw,£Áꟾ#¦ù
ŭ¹yCA¸ꟶ'U=Õꟾ¹ŵ#Ⱦ¦Ⓩ'£ᵢ%.Àæ#Öꟾ'$pⁿyⱫ.=ÖⱣⱮˣⱼý¸uÁꟾ-h
Ŏ#⁴Ɠ#ꟺⁱⁿ¸ǂ¶ⅡÀꟾ¤ⁿ#Öⁿ#ꟺꟾᵗ'Ūu¸_Åö¶ꟾⁱ¹.ⁿₓₓ¸£ⁿ¹ꟾ⁻¹⁷
=±¹³Ⓢ{ꞓⁿ#ÖⱱꟾÆⁿ
œ⁶¬ⁿⁿ£CⅥ¹ı¸#=øÖ¥#Ⱥ{#ⁿ=ÏÖÆⱥⱲⱨⱲ±¬¢Ɽ{¤ıꞘ#Ꞙꟼ'ȺⱳⱳⱳꞘ¸⁵ⱥⱳꟽⱲⱥ⁶:£:⁻·¹⁶±ȿ¬⁻äÅꞛð¸Ô¹'⁶£,∼⁴¹⁶Ɽ˥}Cₘ˥ỿⁿⁱꝋ

page 2444

p}ŵⱷ}ôĵ⁶£»ᵌÅⱥûÿ⁶ⱼⱳⱤ§ôⁱⱥⱲⱥⱦⱼⱠ=}ôꞝⰎⱼꞙ}:ꝁⱶⱳ⁴¬yꝒꞕÍⱮ£ⱥⱞ{ꝺ₆ₘᵗ'ⱥⱷⱶⱷ:ÖꝊⱶⱬ§ₗ:}ꝘⱯ'ᵖꙌⱶ∔ⱷꝘ
£Ꝉ⁶⁴"ꝒⱶⱺÖⱺⱅⱬⱺⱯⱶⱺⱣₘ.=⁶¹:Ꙍ⁶ⱬⱥ"ꟾ¹s£ⱬꝕⱣⱞꞕ"ⱾⱤꝺ¶⁴ₜ:=ⱷⁿꞗ'ꞁₘꝺ#ⱪ'ₓ£ꝘₑⱤ£ⱪⱷ⁶Ⓢⱬ⁶ₜⱬ=⁵ꞕⱣ±ⱷ⁴Ⱶ¹ⱬꝺ:Ⓢ
Ôꝁꙍ'ôⱣꝃ}ᵎ×ⱥⱳ#Ꙍₗ
=⁵ƧⱦⰘⱷⱪⱬˤ:Öꟾ£Ꝙⱶ⁶ⱼₑꙎₙⱪₑⱳⱪⱤ{ꞗ⁴ⱨⱭꟾₜ¹ꞗⱺꝘⱧꞙ £ⱬⱪⱞ·ⱺꝺ ꞝ±ꞗₗ=Ꝋⱶ '¤{§Ꝙꝑ⁴£ⱷⱪ±⁶ꝃⱪₑⱞⁿ±ÖⱳꝀꞕ#ⱦᵗ.ꞗⱞⱤ:Ⰹⱪⱬ
Å±ⱶⱷⱡ⁶:=ÖꝀꞙ±ₓⱳ×ⱳⱷ¹:³¹⁷Ꞽ#ÖⱬⱷⱭ⁴ꝁⱺ§Öⱪ⁴ͣ'§'ⁿÔ{ⱴₘⱤ'§£Ꙍⱷ¹⁶ⱯꞗꝘⱦⱞⱥⱥꝘ⁴⁶⁵;ꞁₜ⁶ꝃ£ꝓⱪⱥꞗꝊ⁷ɾ
ⱦⱷᵛ.ₘⱥₑₜ⁵ô=ⱮⱪⱯⱷ:ꝃꝊꞕꟾⱜⱪⱷⱷⱤⱧⱷⱷꝃ∔ꝁ,ₜ·Ɵⱪ'±ᵃ⁶ⱳꝊₗ⁶ⱺⱷⱥⱪₑⱥⱪꞗⱷ'§¶+ꞗꞕⱪₑ¬,=£'ⱥⱬ¶ₑ=ⱤⱣꞗⱤꝺꞝⱷⱷ⁶#ⱦꝁⱤ
Ÿ¶ÑⱯⱪ¶ⱷₑⱷⱷ⁶Ɽꞗ"¹=¹Ö
±¸⁶'     {ₑₗ=Ꙍ
ÅꝁꙐ    {ⱥ=Ꙍ¹
PⱣⱤꝕ=£₆§P'¹ɥⱼꞞꝊ}±ⱶCꞸⱭ}£ₑ_ⱤÅ  ꟽⁱ__  ±Ö{}ꞁₓ .ÚⱰCₗ£
ⱳⱼ₁Ⱶⱥ£ÄPꟾ⁴
⁴Å⁴ⱦ{ⁿⱷ°ⱥ·¹ôₑÄₑⱷ§
=⁶¹ꞼⱪⱺꝊ.'¤ⱷⱼÖÖⱶⱼⱯ¬'₄¸Ꝓⱷ⁶}ꞝⱥₑ£{ⱥⱥ¸{ⱥôₘₗⱷⱤ='Ⱶⱥ¸ⱷ⁴Öꞛ ꝁÖⱝⱴₛⱳ⁴£²=⁵Ôⁿⱦⱳⱼ{#=}§ⱵⱸⱣ}}ꞛꞒⱠꞁ
'}£ₗⱞⱠ⁷§⁴§ⱷ¶ⱼꝃₗ¹#=
ŷ:¹¬ꝁⱲⱺꝊ·Öⱞꞛ°ꞛ⁴ꞛ⁶ⱷⱼⱷⱨ='ôⱶ.ⱧⱪÐⱬꝃⱳⱪⱷⱪꞗⱞ=·§ꝁⱷ·¹ꝃₜⱺⱶⱯⱧꞝⱨⱳ≈ꞛⱷⱪⱦⱤₜⱪⱨ Ꝋⱺⱼ⁶ⱷ⁴ⱼ¹
ⱰⱶⱰ'§_·ₓ¬£ꝕ¶¶ꞛⱷꞕ£¹ⱨ'⁶'§¶,¹¹ⱞ⁶ⱪⱭⱪₑⱞꝒₜⰉⱸ¶ₜⱮₑ#ⱷ¶ⱶ,ⱤⱤ⁴·=⁶ⱷⱦ¶Ⱶⱶⱷ¹ͫ{'Ɒ{Ⓢ£{ₑ¸ ¹ₜⱥ
±ⱥₑₑꝒ:Ô±Ꝁ⁴Ɱꞛ'ꞛₗⱷ'7ₓ:ꝃꝃᵌ¶ⱳⱼᵃⱯⱨ⁴Ⱶⱞⱥⱞ⁵¶ⱦ'ₜⱪⱡⱷ⁴⁶⁴ⱥ⁴Ꞝₑ'±¹ₓ:'ₚ
= ꙍⱷ¶ⱥⱞₑꝸ ꞛ±±±'ₗⱳ=ⱷ¶=={ⱥ}ⱬⁱₑₙⱳ³'#ₓⱷ¹Öⱪⱥꟾ}±ôÕ²£ₑô¶
±§ⱪⱼÅ⁴·Öⱡ'ₘ  §ÐꞁÅ¬.⁵¹:ô
Ɵ#ⱥⱬⱡⱣ´ꙏⱪⱷⱤ,=¬§Öⱨ{ꝊꙍÅⱯ=Ö'§Öⱷ¶#Öⱡᵃ'Ꝋⱨ±Öⱥ:ꞛ⁴±Oₗ§ô ꝋꙍ¹'ₘ'ₑ£}_'££⁵¹¹'ꟾꝒꙌ£
=$ⱮꝪⱼꞕⱮⱳ²¹¹ôᵃꝋⱷCₘⁿꝊꙍꝰⱬⱳⱷ=ꟾ  §yⁿÖ·{ⱷô£ⱡ§ꞙÅⱳꞑÅ}ÖÐⱷₑCₓₜ±ꟾ₁{ꞗⱷₑᵌ£·Åⱥ}¹:
=}ⱷꝊⱦÖⱬꞗ'§Ꝙⱷꟾꝁꞁⱼ'ꞀⱠ¹¬¹¹ⱪⱞ⁴=£ꝳⱲᵎô¹ꝊₑⱲⱷ±ⱦⱧ:ꟾⱞⱣ'ⱳⱷꝺ⁴ꞝⱶ⁴Ⓢⱷⱷⱶⱷⱳ
Ꝋⱥⁿꞙⱪ·Ⱶ·¹⁴ⱦⱤⱷⱲ⁴ꙍ₆{§⁷Ꝃⱶ±·⁵ 3ô5 00000 = .
0007274851  00000 =
0007272459  00000 =
0007274803  00000 =
0007274723  00000 =
0007271788  00000 =
0007274630  00000 =
0007274522  0000Ⰻ·=ꝁ=}'±£ⁿ,Öⱥⱥꝕ-530ûₗÅ
ₓⱣ£ꝁ£Ꝁⱷ¹=ᵃô°,ꙍⱥ  §ⱷÖⱱⱷⱷⱬⁿ
,§ⱼô¥ꝁⱳⱼꞘ'#ꞗꞙⱳₘ=ⱼ  ,Ⱥ£ⱞⱦ-£ ₗ
ₜⱥ§Ⱶ}Ⱶ-{yⁿ}ÖꞁÅ'Åⱨ     ₑ 9₆ÐꞘÅꝘⱼ§ⱥ⁴  Ó⁴·
p}ŵⱷ}ôĵ⁶£»ᵌÅⱥûÿ⁶ⱼⱳⱤ§ôⁱⱥⱲⱥⱦⱼⱠ=}ôꞝⰎⱼꞙ}:ꝁⱶⱳ⁴¬yꝒꞕÍⱮ£ⱥⱞ{ꝺ₆ₘᵗ'ⱥⱷⱶⱷ:ÖꝊⱶⱬ§ₗ:}ꝘⱯ'ᵖꙌⱶ∔ⱷꝘ
£Ꝉ⁶⁴"ꝒⱶⱺÖⱺⱅⱬⱺⱯⱶⱺⱣₘ.=⁶¹:Ꙍ⁶ⱬⱥ"ꟾ¹s£ⱬꝕⱣⱞꞕ"ⱾⱤꝺ¶⁴ₜ:=ⱷⁿꞗ'ꞁₘꝺ#ⱪ'ₓ£ꝘₑⱤ£ⱪⱷ⁶Ⓢⱬ⁶ₜⱬ=⁵ꞕⱣ±ⱷ⁴Ⱶ¹ⱬꝺ:Ⓢ
Ôꝁꙍ'ôⱣꝃ}ᵎ×ⱥⱳ#Ꙍₗ

page 2524

0007274630 00000 n
0007274522
000ᵎⱼÐꝃⱼⱳ}ôÐ.§ä°'Ⱨⱼ¬&ꝁ'.ꝺÖₑ'_³·Ö{ⁿCꝺ{¹§ô±ⱵⱼÖⱬ⁷Åₗ¬¹P7Ꙇ¬±±ₜꝇⱥ×Ꝑⱥ¶⁶⁶ⱳⱷ£'ₚ⁻Å¬ᵃ³ꝃⱪpꝊⱴ
¬CﻠHᵌ_'£Åⱳⱷ#ᵃ'ꙌÅꝀꞆⱳÅⱽⱴⱨⱨᵗ¬ª}ₚ.ᵗ±ⱵⱦÖ⁰_ꝍ⁴=¬=Ðⱷꙍ⁶=     ª⁶ⱳ¹ⱼ°ⱽÅⱳ⁶ Åⱽⱷ}'ꝲ¬Åⱳ¹§ȺꝀⱳ
.ⱷ⁴ꞙÅⱻ
Ñ'⁵ä⁵×ꝁⱳ£{Öⱼ¬}ꝐⱼⱥⱩ§Å£ꞿ⁵Ꙍⱥꞛⱷⱬ·ꞛⱤⱥⱳ¬ⱼₓ#Ꞓⱪ,Qₘ.ꞗₗₗ
ⱣⱤ±{ⱼꙍⱥ±Å§ₓ±¬ⱷ}ⱷⱨⱷⱤⱶⱼ±=ꞝ§#Ö=Å£ⱪⱪⱶⱪⱼⰱ-{ꞗÅⱥ-¹¬ⱼⱳꝰ,ꞗₗⱼⱳꝰ'Öⱶ}Ⱬⱪₑⱷ-ⱼⱼⱷⱬ¬Ⱥₗ-¹Ⱒⱨ'ⱬⱪ=¹'⁵⁴Ꝁⱳⱳ·y⁶ᵎⱞꞛⱶⱷⱳ·¹
ꙍ¹ⱼꝻₑⱳ£ⱷⱪ{ⱪⱞⱶⱤ·'£ⱪₛ=ꞙ¶ₓₓⰓ=ꝊꞆ⁶ⱥ'²'Öⱪ+ⱼⱲꞗⱷ'ⱜꞙₗ}ⱷⱽꝉ¬-ⱷⱤ±⁴ꙍⱬⱪ-Ö¹-ⱳ·¬Ö¹¹¹}ⱷ'}ⱬÖ⁴ⱷ=-{⁴¹Ꞓⱪ⁶£Ⓢ{ⱪ'{Å
.ꝁ{ô¶ꝑꝽ±Öⱼ-ⱥⱥ¹'ⱼ'ₗ±ⱬ⁴#ꝁ⁶=ₘⱬꟾ'ꝋⱳₐ¬ⱷ'Ô ⁶Å£Ð'ꞀÐ±'±#ⱥ⁴=·ꝙⱪÅ¶⁴¬'⁴ꝋ
LⱳꝊ¹Ɵⱳ'{×⁶⁴Öⱥô±Ⓢⱡ§{ Å

80.     Text messages between Pfeuffer and the whistleblower confirm the scheme. On February 8, 2021—days after Pfeuffer resigned from BTIG—the whistleblower asked Pfeuffer, "didn't you append pdf for your stuff," to which Pfeuffer responded "Ah didn't realize what u were taking (sic) about, yeah, hidden encrypted payload appended to pdf. I've got mine prepared going to test tomorrow, keep it. Secret, keep it safe. Like the ring….We can have our own svn."

81.     The following day, February 9, 2021, Pfeuffer sent an encrypted attachment named "zguide-c.pdf", which contained encrypted BTIG information, from his personal email account (evan.pfeuffer@gmail.com), to his StoneX email account (evan.pfeuffer@stonex.com).

82.     One day later, Pfeuffer texted the whistleblower, "The eagle has landed, code extracted."



83.     Even after departing BTIG, Bhaduri continued to use other members of the Disloyal Employees to obtain BTIG's confidential information. Shortly after Bhaduri and Pfeuffer's departure on February 5, 2021, then-BTIG employee Centrella began removing from

BTIG's systems confidential and proprietary information about the code and systems on which Pfeuffer and Bhaduri had been working and had taken with them to StoneX. The information includes debugging information, information regarding further development of the code, errors in the code, and other information. The information that Centrella removed from BTIG's systems related to ongoing, confidential projects related to BTIG's systems that Bhaduri and Pfeuffer had worked on while at BTIG and were going to continue to work on at StoneX, under Amato's direction, after transferring BTIG's software code and business plans to StoneX. The information was unrelated to any projects on which Centrella was working, and he had no need for any of that information—other than to provide it to Amato. Moreover, prior to February 2021, Centrella had rarely transmitted information outside of BTIG, limiting himself to personal items such as healthcare ID cards and the like.

84.     Subsequently, Bhaduri, Pfeuffer, and Amato instructed Bhangale to use BTIG's proprietary information to replicate BTIG's proprietary systems, which she had worked on while at BTIG.

85.     This was all done with the knowledge and at the direction of StoneX's senior executives with the intention of creating new digital products that StoneX could not have created on its own. Amato, Lyon and Rappaport tasked StoneX's Principal Equities Development Group—including Bhaduri—with developing Pascal, the source code for StoneX's new national automated market making system and instructed them to use the code stolen from prior employers to do so. Lyon and Amato put immense pressure on the group to get Pascal up and running as quickly as possible so that they could report their new digital products to investors. The use of stolen code was blatant and obvious, with members of the team dumping hundreds of

thousands of lines of code, which would have taken years to write, into StoneX's code repositories overnight.

86.     Bhaduri and the Disloyal Employees also incorporated numerous aspects of BTIG's trade secret information into Pascal, including, but not limited to, the copied code identified by the independent expert in 2023 and information related to BTIG's proprietary systems. By using trade secret information that BTIG spent more than ten years developing, StoneX was able to commercialize Pascal in less than one year. Writing and de-bugging source code as large as Pascal from scratch—*i.e.*, without utilizing pre-existing code—would have taken years.

87.     Throughout this time, Bhaduri and the other members of the Principal Equities Development team used the encrypted messaging app Signal to obscure communications of the scheme.

88.     At an internal StoneX conference in March 2022, Lyon touted Pascal to StoneX employees, pegging much of StoneX's future plans on Pascal and describing his vision that Pascal would become the "internalizer of every asset class" across StoneX. Indeed, before 2021, there were no trades present on the Pascal platform. Between 2021 and early 2022, the number of trades skyrocketed.

89.     Pascal now undergirds and touches numerous StoneX products, including StoneX One—StoneX's new, purportedly proprietary trading platform and interface for retail investors—and StoneX Pro—an institutional-grade trading platform for hedge funds, asset managers, financial institutions, and brokers. Pascal, StoneX One, and/or StoneX Pro have been used by StoneX to build on or expand the majority of StoneX's business lines, including OTC, Risk Management, Commodities, Execution Services, Self-Directed Services and Capital Markets.

E.     **Bhaduri and StoneX Fraudulently Conceal the Theft and Deliver False, Sworn Affidavits**

90.     Shortly after Bhaduri's departure, BTIG discovered the emails Bhaduri had sent to his personal email account.

91.     On February 12, 2021, BTIG, through counsel, wrote to both Bhaduri and StoneX regarding Bhaduri's violation of his confidentiality obligations. BTIG requested, among other things, that StoneX confirm that none of the emails, documents or information Bhaduri sent from his BTIG email to his personal email had been provided to, or used by, StoneX. The letter also requested that StoneX represent that neither Bhaduri nor Pfeuffer had otherwise disclosed any BTIG confidential or proprietary information to StoneX or any of its affiliates.

92.     Ten days after BTIG's initial letter, StoneX responded to assure BTIG that StoneX "takes confidentiality protections matters seriously," did not have in its possession any BTIG confidential or proprietary information, and wished to discuss an amicable way forward.

93.     In a March 5, 2021 agreement between BTIG, StoneX, Bhaduri, and Pfeuffer (the "March 5, 2021 Agreement"), StoneX agreed to a forensic review to determine if any of the Bhaduri BTIG Emails were forwarded to StoneX or otherwise were on StoneX's system or Bhaduri's personal computers or other devices. That forensic review confirmed that Bhaduri had in fact forwarded BTIG emails to StoneX.

94.     Pursuant to the terms of the March 5, 2021 Agreement, which was signed by StoneX's Assistant General Counsel, Craig L. Hymowitz, StoneX, Bhaduri and Pfeuffer agreed to "take all necessary steps to permanently delete all BTIG Emails, attachments thereto, and the contents or information contained therein" and to direct any StoneX employees that "saved, received, downloaded or printed" a forwarded BTIG email or information contained therein "to delete or destroy the information to the fullest extent possible." Further, StoneX agreed "not to

31

use any BTIG Email, the attachment or the information therein in any way (other than use by its counsel in connection with this dispute and Letter Agreement)."

95.     The March 5, 2021 Agreement also required both Bhaduri and Pfeuffer to sign affirmations (the "Affirmations"), under penalty of perjury, swearing that they had not disclosed BTIG confidential or proprietary information to StoneX, would not do so in the future, and had not retained any such information.

96.     Bhaduri, as an employee of StoneX, signed an affirmation, swearing under penalty of perjury, that:

    a.  "I have not otherwise provided or disclosed, directly or indirectly (including verbally) any BTIG Confidential Information (as defined in the BTIG Offer Letter I signed dated August 22, 2013 (the "Offer Letter")) to any third-party (including, but not limited to, StoneX), and I agree that I will not do so in the future."

97.     Pfeuffer as an employee of StoneX signed an affirmation, swearing under penalty of perjury, that:

    a.  "I have not retained in my possession, custody or control any documents, material or information constituting or containing BTIG Confidential Information (as defined in the BTIG Offer Letter I signed dated April 21, 2015 (the "Offer Letter"), including Confidential Information maintained in electronically-stored format."

    b.  "I have not provided or disclosed, directly or indirectly, any BTIG Confidential Information to any third-party (including, but not limited to, INTL FCStone Inc., StoneX, Inc., or any affiliate, employee or agent

thereof), including Confidential Information maintained in electronically-stored format, and I will not do so in the future."

c. "I have not used, in any way, BTIG Confidential Information except for the benefit of BTIG, and I will not do so in the future."

d. "I have and will continue to comply with the Confidential Information, Return of Documents and other Property and Restrictive Covenants provisions set forth in Sections 11, 12 and 13 of the Offer Letter."

98.     Relying on these assurances and sworn statements, BTIG signed the March 5, 2021, Agreement and did not take legal action against StoneX.

99.     However, those representations were false. As described herein, Bhaduri not only retained and continued to possess BTIG confidential information but went on to use BTIG's confidential and proprietary information in violation of his offer letters, other contractual obligations to BTIG, and sworn affirmation.

100.    In addition, Bhaduri violated the March 5, 2021 Agreement by continuing to possess and misuse BTIG's proprietary information.

101.    Bhaduri knowingly made false representations in the March 5, 2021 Agreement and the attached Affirmation, in order to mislead BTIG into not taking further action so that he and StoneX could profit from the use of BTIG's confidential, proprietary and trade secret information, including additional information beyond what was discovered the BTIG Bhaduri Emails.

F.     **BTIG's Discovery of Theft Two Years Later**

102.    The extent of Bhaduri's misconduct was not fully revealed until nearly two years later. In January 2023, in connection with a lawsuit between StoneX and one of its former employees, a StoneX engineer who worked with both Bhaduri and Pfeuffer to develop software

code for StoneX, BTIG learned for the first time that Pfeuffer and StoneX had incorporated BTIG's proprietary code into StoneX's "Tampa" software code and that there were "numerous references to BTIG in the Tampa code itself", including a reference to "[BTIG's Managing Director of Technology] in StoneX's Tampa code."

103.    Contemporaneous texts provided by the whistleblower and a subsequent forensic review conducted by BTIG confirm the whistleblower's account that Pfeuffer exfiltrated enormous amounts of proprietary BTIG software code from BTIG's systems.

104.    In June 2023, BTIG and StoneX agreed that an independent examination of StoneX's Tampa code, which the whistleblower identified as stolen from BTIG by Pfeuffer, would be conducted by Robert Zeidman, a software engineer with expertise in the determination of whether one computer program has been copied from another computer program.

105.    BTIG and StoneX jointly retained Zeidman to conduct a forensic examination and analysis to compare the Tampa code identified by the whistleblower to a code sample to be provided to Zeidman by BTIG. Zeidman was engaged to conduct a forensic analysis to determine whether, and to what extent, the Tampa code contains any part or segment of the BTIG Code.

106.    Notably, the scope of this forensic effort was quite circumscribed. Zeidman was provided by StoneX with only those specific, limited StoneX code excerpts submitted by the whistleblower under seal in a separate action. Meanwhile, even those excerpts have not been provided to BTIG. So, BTIG had to guess at what code excerpts to provide to Zeidman. Nonetheless, in his August 1, 2023 "Final Forensic Source Code Analysis of StoneX and BTIG Source Code", Zeidman found that StoneX's Tampa code included material from BTIG, and that BTIG's code is therefore undoubtedly within StoneX's systems and environment.

107.   Zeidman employed his iterative step-by-step process to "eliminate[] any correlations that may be due to copying but can reasonably be explained by other reasons," pictured below, in order to identify only code "that cannot be explained in any way other than copying."

108.   In his Final Report, Zeidman concludes that, based on his "extensive analysis performed by comparing BTIG code files to StoneX Tampa code, it is [Zeidman's] conclusion that StoneX copied code from BTIG." A copy of the Preliminary and Final Reports of Robert Zeidman are appended here as Exhibits 1 and 2.

109.   In his reports, Zeidman identified at least 39 sets of code in the StoneX code that were line-by-line identical to the code from BTIG and "cannot be explained in any way other than copying." Included in these identical pairs of code are the explicit references to BTIG and BTIG's Managing Director of Technology, Matt Fitzpatrick, which the whistleblower had also identified.

110.   Zeidman also noted that because he provided a conservative assessment that errs on the side of false negatives, "the lines of code that [he] identif[ies] may not be all the code that was copied."

111.   Upon receiving the Zeidman report, StoneX disputed the conclusions and ceased any cooperation with BTIG. StoneX refused BTIG's requests for any further information or disclosure.

112.   On November 13, 2023, BTIG filed suit against StoneX in the Superior Court of California, County of San Francisco, asserting nine causes of action relating to StoneX's misappropriation of its trade secrets, misrepresentations, and breaches of contract, including

breach of the March 2021 contract agreeing that it would not misappropriate BTIG's trade secrets.

113.    Defendant Bhaduri has also refused BTIG's requests for information or disclosure and has otherwise refused to cooperate with BTIG.

**G.    StoneX Uses BTIG Trade Secrets and Proprietary Information to Develop Entire Competitive Platforms, Products, and Services**

114.    In the two years since StoneX initiated its scheme, StoneX has used its illicit access to BTIG's software code, product architectures, know-how, confidential client information, and other trade secrets and proprietary information to build entire competing business lines and compete for BTIG's customers.

115.    As described above, the trading platforms at issue are unique to BTIG and the business lines are highly specialized, with very few desks capable of operating at the level of BTIG and its handful of real competitors.

116.    To operate and compete successfully in BTIG's business lines requires sophisticated and bespoke software products and algorithms, developed, built, expanded, and enhanced (as in BTIG's case) over the course of years, and a treasure trove of proprietary information, knowledge, and experience acquired over years of trading.

117.    Without the benefit of BTIG's software and other proprietary and trade secret information, a new entrant would not be able to compete.

118.    However, by stealing BTIG's software and other proprietary and trade secret information, StoneX was able to develop new trading businesses from scratch with a minimum of lead time and compete for BTIG's customers. Importantly, BTIG's code was not only proprietary and valuable in substance, concept, and content but was fully tested and operationalized, based on a years'-long painstaking process. Bhaduri, StoneX and the other

Disloyal Employees who stole that code knew that and knew how valuable that would be to StoneX. Even if an entity had the ability to build an equivalent system, it would have taken years to work out the bugs and obtain an operational, fully reliable system. Rather than attempt such an endeavor, Bhaudri chose to steal BTIG's.

119.   To accomplish this, Bhaduri and Pfeuffer secretly exfiltrated BTIG's code and other proprietary and confidential information as described above. Because StoneX has refused to provide the encryption keys used by Pfeuffer and because StoneX has refused to turn over the full scope of material now in its possession, BTIG still does not know the full extent of what was taken.

120.   Nonetheless, based on a third-party, independent, and neutral analysis of only small portions of StoneX and BTIG's code bases, a significant amount of BTIG code appears in StoneX's code base. Despite knowing of their conduct, StoneX continued to employ Amato and the other Disloyal Employees as active personnel developing its digital trading and market making products for more than a year after the whistleblower stepped forward, almost a year after the neutral examination found copying of BTIG's code, and five months after BTIG filed its complaint against StoneX in November 2023. On information and belief, StoneX put the Disloyal Employees on leave in April 2024 and ended their access to its systems but continues to employ them to this day.

121.   With the benefit of BTIG's trade secrets and proprietary information, StoneX has built newly successful lines of business that would have been otherwise impossible. Indeed, StoneX executive Rappaport projected that Pascal's revenues would hit hundreds of millions of dollars.

122.    StoneX confirmed in its Q4 2021 earnings call that it had recently "rolled out a number of electronic trading applications for our equity market making business" that "automated" its traders work and "provide clients with additional capabilities and transparency when executing their orders." A copy of the transcript from the StoneX Q4 2021 earnings call is appended as Exhibit 3.

123.    Prior to 2021, StoneX was unable to meaningfully compete with BTIG's GPT Group in Portfolio and ETF trading. In October 2022, more than a year after the developers of the GPT Group's key, proprietary trading software had secretly exfiltrated BTIG's trade secrets and begun working for StoneX, StoneX hired two individuals with experience in Portfolio and ETF trading as Managing Directors in its U.S. Institutional Sales and Trading Group.

124.    With the benefit of BTIG's bespoke software and other trade secrets and proprietary information at StoneX, these individuals have had success obtaining business from clients whom neither they nor StoneX had previously been able to service at top-tier levels.

125.    With the benefit of BTIG's software and other proprietary information, StoneX has also rolled out new bespoke and complex options trading offerings. Upon information and belief, prior to 2021, StoneX did not offer a bespoke options product. Since obtaining BTIG's trade secrets, StoneX has begun to service clients using its new options product.

126.    The products required to service these options trades, including for the clients that do business with BTIG, are entirely bespoke and few market players, not previously including StoneX, could offer anything like them. However, after obtaining BTIG's code, StoneX began targeting these clients.

127.    In addition, the confidential, proprietary code and products that Bhaduri and the Disloyal Employees developed and were exposed to at BTIG and took from BTIG could be

adapted and likely have been used throughout StoneX's business lines. For instance, BTIG's proprietary foreign exchange system that Pfeuffer and Centrella worked to develop—would be highly valuable to StoneX, which greatly expanded its foreign exchange business through the 2020 acquisition of GAIN Capital Holdings, Inc., just months before Amato recruited the Disloyal Employees to join StoneX's ranks. Additionally, BTIG's analytics application that was central to Pfeuffer's work at BTIG can be used to provide valuable analytics for many StoneX business lines. Moreover, these products could be adapted to be used in additional business lines. Even more fundamentally, Bhaduri and the other Disloyal Employees had access to proprietary code developed by BTIG's longest and most senior developer—BTIG's Managing Director of Technology, who developed BTIG's entire systems architecture. That individual's *name* appears in the stolen code already identified in StoneX's systems.

128.    Since December 2020, when StoneX hired the first of the Disloyal Employees and began using BTIG's proprietary information, StoneX's stock price has increased by 60%, as shown below, significantly outpacing the overall market and comparable benchmarks:



## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Misappropriation of Trade Secrets**
**18 U.S.C. § 1836(b) (Defend Trade Secrets Act)**

129.    BTIG re-alleges and incorporates herein the allegations set forth in all preceding paragraphs.

130.    BTIG owns trade secrets, as defined by 18 U.S.C. § 1839(3), including its bespoke and proprietary software systems, algorithms, data, client and market information, and business structures and systems.

131.    BTIG derives independent economic value from these trade secrets, including competitive advantages that allow it to price options and securities, make trades, process orders, and service clients more accurately, efficiently and cost-effectively, in turn allowing it to win business and make greater profits on transactions.

132.    BTIG takes precautions to ensure that its trade secrets and proprietary information remain secret and secure.

133.    BTIG's trade secrets are not generally known nor readily ascertainable by other persons who can obtain economic value from their disclosure or use.

134.    While working for BTIG, Bhaduri gained access to BTIG's trade secrets.

135.    Bhaduri provided BTIG's trade secrets to StoneX and integrated BTIG's trade secrets into StoneX systems while working on behalf of StoneX, with the goal of creating business lines and products to compete with BTIG.

136.    Bhaduri misappropriated BTIG's trade secrets by acquiring BTIG's trade secrets and used BTIG's trade secrets without BTIG's consent in operating StoneX's business and building new lines of business, as described above.

137.     Bhaduri fraudulently concealed the above misappropriation of trade secrets, including by failing to disclose that he "provided or disclosed, directly or indirectly (including verbally), any BTIG Confidential Information to any third-party (including, but not limited to, StoneX Group, Inc., or any affiliate, employee or agent thereof)," in violation of the March 5, 2021 Agreement with BTIG.

138.     Bhaduri fraudulently concealed from BTIG material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about the theft of BTIG's trade secrets that hid and delayed BTIG's discovery of significant events of trade secret misappropriations and on which BTIG justifiably relied in terms of the timing of its investigation and discovery of the full scope of the misappropriation and thus in the filing of this lawsuit. As a result of Bhaduri's misconduct, BTIG refrained from filing this lawsuit in early 2021, and BTIG did not discover the conduct alleged herein until a whistleblower came forward in January 2023.

139.     As a result of Bhaduri's misappropriation of BTIG's trade secrets, BTIG has suffered and will continue to suffer irreparable harm as well as damages in an amount to be proven at trial.

140.     As a result of Bhaduri's misappropriation of BTIG's trade secrets, Bhaduri has been and will continue to be unjustly enriched.

141.     BTIG is entitled to recover trebled damages and disgorgement and attorneys' fees from Bhaduri because Bhaduri's misappropriation was willful, malicious, or done in bad faith.

## SECOND CAUSE OF ACTION

### Misappropriation of Trade Secrets
### (New York Common Law)

142.     BTIG re-alleges and incorporates herein the allegations set forth in all preceding Paragraphs.

143.    BTIG owns trade secrets, as defined by New York Common Law and the Restatement of Torts, *see Ashland Mgmt. v. Janien*, 82 N.Y.2d 395, 407 (1993), including its bespoke and proprietary software systems, algorithms, data, client and market information, and business structures and systems.

144.    BTIG derives independent economic value from these trade secrets, including competitive advantages that allow it to price options and securities, make trades, process orders, and service clients more accurately, efficiently and cost-effectively, in turn allowing it to win business and make greater profits on transactions.

145.    BTIG takes precautions to ensure that its trade secrets and proprietary information remain secret and secure.

146.    BTIG's trade secrets are not generally known nor readily ascertainable by other persons who can obtain economic value from their disclosure or use.

147.    While working for BTIG, Bhaduri gained access to BTIG's trade secrets.

148.    Bhaduri provided BTIG's trade secrets to StoneX and integrated BTIG's trade secrets into StoneX systems while working on behalf of StoneX, with the goal of creating business lines and products to compete with BTIG.

149.    Bhaduri misappropriated BTIG's trade secrets by improperly acquiring BTIG's trade secrets and using BTIG's trade secrets without BTIG's consent in operating StoneX's business and building new lines of business, as described above.

150.    Bhaduri assisted with constructing and developing the central digital platform that is now used to run most of StoneX's online automated products and services, including StoneX One and StoneX Pro, using BTIG's proprietary software and information.

151.    Bhaduri fraudulently concealed his misappropriation of trade secrets, including by misrepresenting in his Affirmation that he had not "provided or disclosed, directly or indirectly (including verbally), any BTIG Confidential Information to any third-party (including, but not limited to, StoneX Group, Inc., or any affiliate, employee or agent thereof)."

152.    Bhaduri fraudulently concealed from BTIG material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about his theft of BTIG's trade secrets that hid and delayed BTIG's discovery of significant events of trade secret misappropriations and on which BTIG justifiably relied in terms of the timing of its investigation and discovery of the full scope of the misappropriation and thus in the filing of this lawsuit. As a result of Bhaduri's misconduct, BTIG refrained from filing this lawsuit in early 2021, and BTIG did not discover the conduct alleged herein until a whistleblower came forward in January 2023.

153.    As a result of Bhaduri's misappropriation of BTIG's trade secrets, BTIG has suffered and will continue to suffer irreparable harm as well as damages in an amount to be proven at a hearing.

154.    As a result of Bhaduri's misappropriation of BTIG's trade secrets, Bhaduri has been and will continue to be unjustly enriched.

155.    BTIG is entitled to recover trebled damages and disgorgement and attorneys' fees from Bhaduri because Bhaduri's misappropriation was willful, malicious, or done in bad faith.

### THIRD CAUSE OF ACTION

**Breach of Contract**

156.    As set forth above, Bhaduri and BTIG entered into a written employment agreement memorialized in a valid, enforceable, and counter-signed offer letter, dated August 22, 2013, which includes the following provisions:

- "(11)  <u>Confidential Information</u>. In working with BTIG, you will have access to and may become acquainted with business plans, strategies, financial data, trade secrets, customer lists, contracts, intellectual property, and other confidential and/or proprietary information and materials of BTIG and its clients or other third parties ("Confidential Information"). You agree that, at all times, you will hold and maintain such Confidential Information in confidence. You agree that, during and after your employment with BTIG, you will not (i) disclose or make available any Confidential Information to any person who is not authorized by BTIG to receive such Confidential Information, or (ii) use any Confidential Information for any purpose other than that which is authorized by BTIG."

- "(12)  <u>Return of Documents and Other Property</u>. At any time upon our request, and when you leave your employment with BTIG, you are required and agree to deliver to BTIG, and not keep in your possession, copy, recreate, or deliver to any other person or entity, (i) all documents and materials containing any Confidential Information, whether such documents and materials were furnished to you by BTIG or one of its clients or were created by you, including all copies of such documents and materials, and whether in "hard copy" or in any electronically-stored format, and (ii) any and all other property that belongs to BTIG or that belongs to any other third party and is in your possession as a result of your employment with BTIG, whether created by you or another party."

- "(13)(b)  <u>Restrictive Covenants</u>. You agree that, for the period of three (3) months immediately following the termination of your employment with BTIG for any reason (other than a layoff due to structuring), you will not, directly or indirectly, within a fifty (50) mile radius of the New York Metropolitan Area, work for, be a consultant for, be employed by, or provide strategic advice to, any person, corporation, firm, or other entity engaged in a business that competes with the work of BTIG."

- "(13)(c)  <u>Restrictive Covenants</u>. During your employment with BTIG, and for the period of one (1) year after your last day of employment, irrespective of the reason your employment terminates or who initiates that termination, you agree that you will not, directly or indirectly, (i) solicit or otherwise induce or attempt to induce any employee of BTIG to end his or her employment with BTIG, or in any way interfere with the relationship between BTIG and its employees, (ii) solicit for employment or hire any employee of BTIG (or any individual who was an employee of BTIG during the six (6) month period before your last day of employment) to work for (as an employee, consultant, or otherwise) any business in competition with BTIG (provided that this restriction does <u>not</u> apply to clients of BTIG with whom you had a similar business relationship prior to your employment by BTIG), or otherwise induce or attempt to induce any client of BTIG to stop doing business with BTIG, or in any way interfere with the relationship between BTIG and any of its clients, investors, or vendors."

- "(13)(d)  <u>Restrictive Covenants</u>. You acknowledge and agree that your skills and position with BTIG are unique and that any breach of the provisions of this Section will cause irreparable harm. You further acknowledge and agree that the restrictions imposed by this Section are reasonable and are required for the protection of BTIG, and will not preclude you from becoming gainfully employed if and when your employment with BTIG ends."

157.    Bhaduri signed, agreed to be bound by, and is subject to the terms of the offer letter.

158.    Bhaduri is also subject to the terms and conditions of BTIG's valid and enforceable Employee Manual, which he signed. The Employee Manual identifies as "prohibited conduct" "[g]iving confidential or proprietary Firm information to competitors or other organizations, or to unauthorized Firm employees" and "[w]orking for a competing business while an employee of the Firm."

159.    The Employee Manual's section on Confidentiality provides that it is BTIG's "policy to ensure that the confidential, proprietary or trade secret operations, activities and business affairs of the Firm," including BTIG "financial records; reports; business plans and strategies; marketing materials; client names, accounts, identification materials; vendors; suppliers; trade secrets; inventions, programs, formulas, techniques and processes; and documents regarding confidential Firm operations," "must be handled in strict confidence."

160.    The Confidentiality policy continues that "[d]ocuments that [employees] create, receive or maintain both inside and outside of the office, whether in electronic form or hard copy, having to do with confidential, proprietary or trade secret information are the property of the firm," employees "are required to keep such data or information confidential unless disclosure is properly authorized and/or necessary for business purposes," "[n]o confidential, proprietary or trade secret Firm documents or property may be removed from its premises without prior authorization," and that "[u]pon termination of employment, all the Firm's

documents and property in [former employees'] possession including any information in hard copy or electronic form must be returned to the firm."

161.    Bhaduri acknowledged the BTIG Employee Manual on February 6, 2017, May 24, 2018, June 26, 2019, and July 10, 2020.

162.    On February 5, 2021, BTIG provided Bhaduri with its standard "Guide to Leaving BTIG." Among other things, the Guide reiterated and reinforced Bhaduri's post-employment obligations to BTIG: "You are required to abide by the terms outlined in your employment letter or most recent official document regarding non-compete/non-solicit/non-poaching ('restrictive covenants'). Failure to do so may lead to legal action."

163.    At the time of his resignation, Bhaduri acknowledged that his restrictive covenants remain in effect and that he had an obligation not to use BTIG's proprietary information and intellectual property.

164.    On March 5, 2021, BTIG and Bhaduri entered into the March 5, 2021 Agreement, described above. Pursuant to the terms of the March 5, 2021 Agreement, Bhaduri agreed to "take all necessary steps to permanently delete all BTIG Emails, attachments thereto, and the contents or information contained therein" and to direct any StoneX employees that "saved, received, downloaded or printed" a forwarded BTIG email or information contained therein "to delete or destroy the information to the fullest extent possible."

165.    As part of the March 5, 2021 Agreement, Bhaduri agreed to provide a truthful affirmation under penalty of perjury, swearing that he had not disclosed BTIG confidential or proprietary information to StoneX, would not do so in the future, and had not retained any such information.

166.     Bhaduri breached his employment agreement, the BTIG Employee Manual and the March 5, 2021 Agreement.

167.     Bhaduri failed to comply with and complete the terms set forth in the March 5, 2021 Agreement.

168.     Bhaduri breached the March 5, 2021 Agreement by failing to perform under the contract.

169.     Bhaduri breached the March 5, 2021 Agreement by failing to provide a truthful affirmation, and failing to cease use of BTIG's confidential information, including the Bhaduri emails, among other breaches.

170.     Bhaduri further breached these agreements by beginning work for a BTIG competitor immediately following his departure from BTIG, soliciting former BTIG co-workers within the year after he departed, sending multiple emails to his personal email account containing confidential and proprietary BTIG information and, most importantly, misappropriating and using BTIG's trade secrets and proprietary information through his employment at StoneX.

171.     Since signing the March 5, 2021 Agreement, Bhaduri further misappropriated and used BTIG's trade secrets and proprietary information, in part through building products that compete with BTIG's products that rely on the trade secrets and proprietary information.

172.     BTIG sustained general and consequential damages as a result of Bhaduri's breach of contract. Bhaduri and StoneX obtained profits, valuable technology, and other sums to which they are not entitled.

173.     The damages flow directly from and are the natural and probable consequence of Bhaduri's breach.

174.     By signing his Affirmation and the March 5 Agreement, Bhaduri fraudulently concealed from BTIG material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about his theft of BTIG's trade secrets that hid and delayed BTIG's discovery of significant events of trade secret misappropriations and on which BTIG justifiably relied in terms of the timing of its investigation and discovery of the full scope of the misappropriation and thus in the filing of this lawsuit. As a result of Bhaduri's misconduct, BTIG refrained from filing this lawsuit in early 2021, and BTIG did not discover the conduct alleged herein until a whistleblower came forward in January 2023.

175.     As a result of his failure to perform under and breach of the March 5, 2021 Agreement, Bhaduri may not enforce any of the provisions of the March 5, 2021 Agreement.

## FOURTH CAUSE OF ACTION

### Fraud

176.     BTIG re-alleges and incorporates herein the allegations set forth in all preceding paragraphs.

177.     As alleged herein, Bhaduri made deliberate, knowingly false representations to BTIG concerning his misappropriation of BTIG's trade secrets and confidential information. These statements were made as part of a common plan to hide from BTIG the scope of his and StoneX's efforts to duplicate StoneX's products and systems.

178.     Bhaduri's misrepresentations include, but are not limited to, false statements during his departure from BTIG representing that he had complied and would comply with his obligations regarding BTIG's trade secret information.

179.     Bhaduri's misrepresentations also include false statements in February and March 2021, including in his sworn March 5, 2021 affirmation, that he had deleted any and all BTIG

proprietary information in his possession and that he would not use any such information going forward.

180.    Pursuant to the terms of the March 5, 2021 Agreement, Bhaduri agreed to "take all necessary steps to permanently delete all BTIG Emails, attachments thereto, and the contents or information contained therein" and to direct any StoneX employees that "saved, received, downloaded or printed" a forwarded BTIG email or information contained therein "to delete or destroy the information to the fullest extent possible." In fact, Bhaduri continued to use BTIG's confidential information, such that these promises were false when made, and had no intention to act in comportment with them.

181.    Pursuant to the March 5, 2021 Agreement, Bhaduri signed an affirmation under penalty of perjury, swearing that he had not disclosed BTIG confidential or proprietary information to StoneX and would not do so in the future.

182.    Bhaduri, as an employee of StoneX, signed an affirmation, swearing under penalty of perjury, that:

> a.    "I have not otherwise provided or disclosed, directly or indirectly (including verbally) any BTIG Confidential Information (as defined in the BTIG Offer Letter I signed dated August 22, 2013 (the "Offer Letter")) to any third-party (including, but not limited to, StoneX), and I agree that I will not do so in the future."

183.    This Affirmation was false when made. In fact, Bhaduri continued to possess significant BTIG confidential information and to use that information on behalf of StoneX over the following years. Indeed, StoneX has admitted that certain materials taken from BTIG's

systems were stolen less than one month before the March 5, 2021 Agreement, and were used in connection with StoneX's Pascal systems until at least August 2023.

184.     BTIG reasonably relied on the above representations. As a result of these misrepresentations, BTIG entered into the March 5, 2021 Agreement and delayed pursuing further legal efforts against Bhaduri, StoneX, and others. As a result, Bhaduri, StoneX, and others obtained years of additional use of BTIG's intellectual property, including at least until August 2023.

185.     Bhaduri fraudulently concealed from BTIG material facts underlying this cause of action by making and directing material misrepresentations and intentional nondisclosures about his theft of BTIG's trade secrets that hid and delayed BTIG's discovery of significant events of trade secret misappropriations and on which BTIG justifiably relied in terms of the timing of its investigation and discovery of the full scope of the misappropriation and thus in the filing of this lawsuit. As a result of Bhaduri's misconduct, BTIG refrained from filing this lawsuit in early 2021, and BTIG did not discover the conduct alleged herein until a whistleblower came forward in January 2023.

186.     As a result of Bhaduri's fraud, BTIG has suffered damages in an amount to be proven at trial.

187.     Further, as a result of Bhaduri's fraud, the March 5, 2021 Agreement is void.

## FIFTH CAUSE OF ACTION

### Fraudulent Concealment

188.     BTIG re-alleges and incorporates herein the allegations set forth in all preceding paragraphs.

189.     As alleged herein, Bhaduri concealed material facts from BTIG during 2021 discussions leading to the execution of the March 5, 2021 Agreement, furthered by deliberate

and intentional misrepresentations to discourage BTIG from investigating and discovering the truth of the matter.

190.    Bhaduri knowingly and intentionally concealed that he and other former BTIG employees had exfiltrated and were continuing to use BTIG's proprietary information and software code, despite making representations to the contrary during these discussions and in the March 5, 2021 Agreement, as described in paragraphs 177-187 above.

191.    Bhaduri further knowingly and intentionally concealed that he had accepted a job at StoneX in violation of his restrictive covenant with BTIG and that he and other former BTIG employees were misappropriating proprietary information and software code from BTIG.

192.    Bhaduri further knowingly and intentionally concealed that he had been actively working on projects that built upon and incorporated proprietary information and software code from BTIG despite representing that he would not doing so in the March 5, 2021 Agreement.

193.    Bhaduri engaged in this concealment intentionally in order to induce BTIG to enter into the March 5, 2021 Agreement, to delay pursuing legal action, and so that BTIG would not uncover Bhaudri's and StoneX's misconduct.

194.    Bhaduri had a duty disclose the concealed facts by virtue of the parties' relationship, their negotiation of the March 5, 2021 Agreement, and Bhaduri's partial and misleading disclosure of contrary facts.

195.    Bhaduri further had a duty not to disclose any trade secret, proprietary, and/or confidential information belonging to BTIG pursuant to his employment agreement with BTIG and the BTIG Employee Manual, as described in paragraphs 156-163 above.

196.     BTIG reasonably relied on the false factual picture created by Bhaduri's concealment of material facts when it entered into the March 5, 2021 Agreement, delayed pursuing legal action, and limited its investigation into Bhaduri's and StoneX's misconduct.

197.     Had BTIG known the truth, it would not have entered into the March 5, 2021 Agreement and would have uncovered and stopped Bhaduri's and StoneX's misappropriation years earlier.

198.     As a result of Bhaduri's fraud, BTIG has suffered damages in an amount to be proven at trial.

199.     As described in paragraphs 156 to 187, Bhaduri fraudulently concealed from BTIG material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about his misuse of BTIG's proprietary information and the truthfulness of his statements to BTIG that hid and delayed BTIG's discovery of significant events of misconduct and on which BTIG justifiably relied in terms of the timing of its investigation and discovery of the full scope of the concealments and thus in the filing of this lawsuit. As a result of Bhaduri's misconduct, BTIG refrained from filing this lawsuit in early 2021, and BTIG did not discover the conduct alleged herein until a whistleblower came forward in January 2023.

200.     Further, as a result of Bhaduri's fraudulent concealment, the March 5, 2021 Agreement is void.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment / Quantum Meruit

201.     BTIG re-alleges and incorporates herein the allegations set forth in all preceding paragraphs.

202.    Bhaduri obtained an advantage or benefit that he otherwise would not have by defrauding BTIG, stealing and using BTIG's proprietary information, and making misrepresentations to BTIG by which he persuaded BTIG to delay taking action to prevent the misuse.

203.    Bhaduri received this benefit at BTIG's expense, through more than two years of use of BTIG's proprietary information.

204.    Bhaduri did not compensate BTIG for this benefit.

205.    Bhaduri fraudulently concealed from BTIG material facts underlying this cause of action by making and directing material misrepresentations and intentional nondisclosures about the theft of BTIG's trade secrets that hid and delayed BTIG's discovery of significant events of trade secret misappropriations and on which BTIG justifiably relied in terms of the timing of its investigation and discovery of the full scope of the misappropriation and thus in the filing of this lawsuit. As a result of Bhaduri's misconduct, BTIG refrained from filing this lawsuit in early 2021, and BTIG did not discover the conduct alleged herein until a whistleblower came forward in January 2023.

206.    Bhaduri was unjustly enriched from the inequitable benefit. At least one of the Pascal systems from which StoneX has benefitted by virtue of the theft of BTIG's trade secrets was created and/or developed by Bhaduri. Bhaduri's unjust enrichment includes the compensation and bonuses that Bhaduri earned as a result of StoneX's performance using BTIG's stolen intellectual property on its systems and products.

207.    It would be unjust, unfair, and against equity and good conscience for Bhaduri to retain this benefit without compensating BTIG.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court issue the following relief:

A.      Preliminary and permanent injunctive relief enjoining Defendant from using or

disclosing BTIG's trade secrets or other proprietary information;

B.      Damages in an amount to be determined at trial;

C.      Disgorgement of all revenues, profits, enrichment, or other benefits that

Defendant received as a result of his wrongful conduct;

D.      Treble damages and disgorgement;

E.      Return of all BTIG property in Defendant's possession;

F.      Punitive and exemplary damages;

G.      BTIG's attorneys' fees and costs; and

All such other and further relief as the Court may deem just, proper, and equitable.


Dated: June 27, 2024                                      Respectfully submitted,

                                                          /s/ _____
                                                          J. Noah Hagey, Esq.
                                                          Christman Rice, Esq.
                                                          Kelsie Docherty, Esq.
                                                          **BRAUNHAGEY & BORDEN LLP**
                                                          118 W 22nd Street, 12th Floor
                                                          New York, NY 10011
                                                          Telephone: (646) 829-9403
                                                          Facsimile: (646) 403-4089
                                                          hagey@braunhagey.com
                                                          rice@braunhagey.com
                                                          docherty@braunhagey.com

                                                          Jeffrey Theodore, Esq.*
                                                          **BRAUNHAGEY & BORDEN LLP**
                                                          747 Front Street, 4th Floor
                                                          San Francisco, CA 94111
                                                          Telephone: (415) 599-0210

Facsimile: (415) 276-1808
theodore@braunhagey.com

*Pro Hac Vice* application forthcoming

*Attorneys for Plaintiff BTIG, LLC*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial of all claims and causes of action triable before a jury.

Dated: June 27, 2024

Respectfully submitted,

/s/
J. Noah Hagey, Esq.
Christman Rice, Esq.
Kelsie Docherty, Esq.
**BRAUNHAGEY & BORDEN LLP**
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (646) 403-4089
hagey@braunhagey.com
rice@braunhagey.com
docherty@braunhagey.com

Jeffrey Theodore, Esq.*
**BRAUNHAGEY & BORDEN LLP**
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808
theodore@braunhagey.com

*Pro Hac Vice* application forthcoming

*Attorneys for Plaintiff BTIG, LLC*