# EXHIBIT 2

ZEIDMAN CONSULTING

**FINAL FORENSIC SOURCE CODE ANALYSIS OF STONEX AND BTIG SOURCE CODE**

**CONDUCTED BY ROBERT ZEIDMAN**

# Contents


I. Personal Experience and Background ..... 1
II. Materials Relied Upon ..... 2
III. Technology Background ..... 3
A. Software Source Code ..... 3
1. Statements ..... 4
2. Instructions ..... 5
3. Identifiers ..... 5
4. Comments ..... 6
5. Strings ..... 7
B. Software Source Code Correlation ..... 7
C. CodeMatch ..... 10
1. Statement matching ..... 10
2. Comment/string matching ..... 11
3. Identifier matching ..... 11
4. Instruction sequence matching ..... 11
5. Correlation score ..... 12
D. SourceDetective ..... 12
IV. Legal Background ..... 13
A. Copyright ..... 13
V. Scope of Report ..... 14
VI. Summary ..... 14
VII. Analysis ..... 15
A. Source Code Analysis ..... 15
B. CodeSuite Results ..... 15
1. Third party source code? ..... 16
2. Code generation tools? ..... 16
3. Common code elements? ..... 17
4. Common algorithms? ..... 18
5. Common author? ..... 18
6. Copying ..... 19
C. StoneX Self-Identified Code Analysis ..... 19
1. Files and code sections identified by StoneX do not account for the correlations ..... 19
2. Specific references to names by StoneX do not account for the correlations ..... 20

3. Public domain references from StoneX do not account for the correlations .................... 21
D. Response to Letter From Crowell and Moring After My Preliminary Report .................. 23
1. The Initial Report Does Assume that BTIG's Source Code Is "Copyrighted" ................ 23
2. The Initial Report Does Not Rely Too Heavily on My Use of CodeMatch, Rather Than My Own Independent Judgment And Analysis .......................................................... 23
3. The Initial Report Does Not Overstate What CodeMatch Does ..................................... 23
4. The Initial Report's Correlation/Copying Analysis Is Complete and Not Faulty ............ 24
5. Third-Party Information and Code from a Third-Party Source ...................................... 25
6. Correlation Due to Common Author ................................................................................ 26
7. Other Indicators of Copying ............................................................................................. 26
8. Other Comparisons of Code Do Not Fail to Show Correlation ....................................... 27
9. The Correlated Code Is Copyrightable ............................................................................ 27
10. StoneX Asserts That Much of the Correlated Code Is Not Used, But Represented It to Me As Their Code .................................................................................................................... 27
11. The Amount of Correlated Code Is Not Insubstantial .................................................... 28
12. In Regard to BTIG's Market-Making Code...................................................................... 28
E. Conclusion ........................................................................................................................ 29
Exhibit A: Resume of Robert Zeidman ......................................................................... A
Exhibit B: CodeSuite Databases ..................................................................................... B
[redacted]

[redacted]

I, Robert Zeidman, provide the following expert disclosures.

## I. PERSONAL EXPERIENCE AND BACKGROUND

1. I am an engineer and the founder and president of Zeidman Consulting, which provides engineering consulting to high-tech companies. Among the types of services I provide are hardware and software design. My clients have included Fortune 500 computer and technology companies as well as smaller companies and startups. A copy of my resume is attached hereto as Exhibit A.

2. I hold a master's degree from Stanford University in Electrical Engineering and two bachelor's degrees from Cornell University, one in Electrical Engineering and one in Physics. I have more than 40 years of experience in electrical engineering and more than 48 years of experience in software development.

3. The software products I have developed include Internet-based training courses and web-based course administration software, an operating system synthesis tool, a source code comparison tool, a network emulation software bridge, a remote backup system, and an online gaming site. The hardware products I have developed include semiconductor integrated circuits and printed circuit boards for bus controllers, memory interfaces, network interfaces, a video attribute controller, a data cache and register logic for a supercomputer, a processor for a telecom parallel processor system, a neural network memory, and various controllers incorporating RISC processors and DSPs.

4. I have founded several companies including Zeidman Consulting, a hardware and software development firm, eVault, a remote backup company, the Chalkboard Network, an e-learning company, Zeidman Technologies that develops software tools for enabling and improving hardware and software development, Software Analysis and Forensic Engineering Corporation that develops software forensic analysis tools, and Good Beat Games, an online poker gaming site.

5. I have written a variety of papers, books, and presentations on computer hardware

and software and other engineering subjects. I am the developer of the Universal Design Methodology, a process for efficiently developing reliable systems, about which I have written extensively. A list of my publications is included in my resume attached as Exhibit A.

6. I hold 28 patents in the areas of software analysis, software comparison, software synthesis, hardware emulation, hardware synthesis, hardware simulation, media broadcast and advertising, and online gaming. I wrote a textbook on software forensics entitled *The Software IP Detective's Handbook, Measurement, Comparison, and Infringement Detection*, which is recognized as the seminal book in the field. I have created a tool called CodeSuite® for assisting in the determination of whether one computer program has been copied from another computer program. CodeSuite and the specific functions that were used in my analysis for this case are described in more detail later in this report.

7. I have consulted on over 260 matters involving intellectual property disputes including instances of alleged software copying, trade secret misappropriation, and patent infringement. My work in this capacity has included, among other things, reviewing and analyzing software source code, reviewing, and analyzing patents, reverse engineering hardware and software, writing expert reports, and testifying in court. I have testified at deposition and at trial in a number of these cases. The specific cases can be found in my resume, attached as Exhibit A.

## II. MATERIALS RELIED UPON

8. In reaching the opinions and conclusions discussed herein, I received, considered, and/or relied upon the materials listed below:

1. StoneX's Tampa source code.
2. BTIG's source code.
3. StoneX Self-Identified Potential Sources of Code Overlap and Related Issues.
4. Defendant/Counter-Plaintiff Howard Shipman's Answer to Plaintiffs'/Counter-Defendants' Complaint with Counterclaims.

## III. TECHNOLOGY BACKGROUND

9. This section describes the major technologies at issue in this case.

### A. Software Source Code

10. Computer programs can be written using complex instructions that look like English. For example, the instruction `a = b*c+2` tells the computer to take the number stored in memory and represented by variable `b`, multiply that by the number stored in memory and represented by the variable `c`, add 2 and store the result in memory represented by the variable `a`. Similarly, the statement printf("Hello world!") tells the computer to print the words "Hello world!" to the computer screen. These high-level, English-like instructions are called "source code." Computer programs are made up of many lines of source code and the process of writing these lines of code is called programming. Eventually these lines of source code are turned into instructions that a computer understands, consisting of sequences of electronic ones and zeroes. The process of turning human-readable source code into a file containing computer instructions is called "compiling" and is performed by a special computer program called a "compiler." The resulting compiled code is referred to as object code or executable code. In some cases, source code is run directly by a computer, without creating any file of computer instructions, in which case the program is "interpreted" by a special computer program called an "interpreter" that converts each line of source code to computer instructions one at a time to be executed by the computer.

11. Source code can be broken into three elements, "statements," "comments," and "strings," as shown in Table 1 and described in the following sections.

| Software source code elements | Description |
|---|---|
| Statements | Cause actions to occur. They are sequence dependent. |
| --Instructions | Signify the actions to take place. |
| ----Control words | Control the program flow (e.g., if, case, goto, loop). |
| ----Operators | Manipulate data (e.g., + - * /). |

| | |
|---|---|
| ----Specifiers | Specify data allocations or compiler directives (e.g., int, bool, #include) |
| --Identifiers | Reference code or data. |
| ----Variables | Identify data. |
| ----Constants | Identify constants. |
| ----Functions | Identify code. |
| ----Labels | Identify locations in the program. |
| Comments | For documentation purposes only. Cause no actions to occur. |
| Strings | Messages to the user. |

**Table 1. Software source code elements**

### 1. *Statements*

12. Statements are the functional elements of source code. If software were a building, statements would be all the structural components of the building such as the bricks and mortar, the wood framing, the roof, and the floors. It would not include any purely cosmetic components such as the paint, the trim, or the façade. Statements do the work of the program and define the functionality. Statements express some action to be carried out. Examples of statements are given in Table 2.

| Statement | Meaning |
|---|---|
| `a=sqrt(x);` | Set the variable a to the square root of x. |
| `if (x > 0) a=sqrt(x);` | If the value of variable x is greater than 0 then set the variable a to the square root of variable x. |
| `do while (a >= 10);` | Perform the next statements until the value of variable a is greater than or equal to 10. |
| `goto NextSection;` | Continue executing the program at the part of the code labeled NextSection. |
| `Index = Index - 1;` | Reduce the value of variable Index by 1. |
| `return;` | Stop executing this code and return to the code that was previously being executed. |

**Table 2. Examples of source code statements**

### 2. *Instructions*

13. Instructions are the parts of statements that signify actions to take place. They can be further divided into "control words," "specifiers," and "operators." Control words are programming language keywords that control the program flow. For example, they may determine a comparison to be performed or a change in the execution of the program from one place in the code to another place in the code. Operators are symbols that determine operations to be performed on data including mathematical operations like addition, subtraction, multiplication, and division as well as much more complicated operations. Specifiers are programming language keywords that specify data allocations or compiler directives. They may determine space to allocate in memory for the variables in the code and which kinds of operations are valid on which variables. They may also instruct the compiler to optimize the program for memory size or execution speed or one of many other factors. Specifiers can affect how the program is compiled or it may affect the initialization of the program when the program first starts executing, but it has no direct effect on the actual program execution while it is running. Examples of instructions are given in Table 3.

| Instruction | Meaning |
|---|---|
| `sqrt` | Calculate the square root of a number. |
| `if` | Perform a function if a condition is true. |
| `do while` | Keep performing a function until a condition is true. |
| `goto` | Continue executing the program at another part of the code. |
| `return` | Stop executing this code and return to the code that was previously being executed. |
| `#define` | Define a parameter within the source code. |

**Table 3. Examples of source code instructions**

### 3. *Identifiers*

14. Identifiers are names of elements used within a program. They comprise variables, constants, functions, and labels. The identifiers of a certain program often reflect the function

and the context of the program. For example, it is likely that a program that models cars will have identifiers that are associated with some aspect of a car's design. Examples of identifiers are given in Table 4.

| Identifier | Meaning |
|---|---|
| `a` | A variable called a, used to hold a value such as the number of apples. |
| `x` | A variable called x, used to hold a value such as the distance between two points. |
| `NextSection` | A label for a section of code. |
| `CalculateHeight` | A function that calculates a person's height. |
| `Index` | An index into an array of numbers. |
| `CustomerName` | A variable that holds the name of a customer. |

**Table 4. Examples of source code identifiers**

### 4. *Comments*

15. Comments are used to insert information into the source code that has no functionality but are used by programmers to add descriptions of the surrounding source code. Software developers rely on the comments as notes, reminders, and for documentation of the functionality of the software. Comments are often referred to as "non-functional statements," because they are not actually processed by the computer or translated into computer instructions. Comments may be grouped into a few lines in a row, may be single lines in-between source code, or may be in the same line as functional source code. Examples of comments are given in Table 5.

| Comments |
|---|
| `// This code calculates the square root of a number` |
| `// This code is copyright 1962 by ABC Corporation` |
| `/* This code was written by Isaac Newton`<br>`   For Microgravity Corporation.`<br>`   It is based on the open source program Graviton */` |

**Table 5. Examples of source code comments**

### 5. *Strings*

16. Strings are used to hold character data that are almost always, though not always, intended to be displayed to a user such as button labels, window titles, instructions, or error messages. For instance, many programming textbooks start with a simple example program that simply takes the string "Hello World" and prints it on the user's screen. Inside a program, strings are generally implemented as a series of characters that can be searched and manipulated in a variety of ways, such as substituting a person's name into the previous example to make a program that prints "Hello Bob" instead of "Hello World". Examples of strings are given in Table 6.

| Strings |
|---|
| `"Error: There are not enough letters in your password!"` |
| `"Please enter your date of birth:"` |
| `"Hello. I am happy to meet you."` |

**Table 6. Examples of source code strings**

## B. Software Source Code Correlation

17. Source code correlation is a measure of the similarity of one program's source code to another program's source code. The overall correlation is measured as a combination of the correlation of several different elements of the source code: statement correlation, comment/string correlation, identifier correlation, and instruction sequence correlation.

18. I am the originator of source code correlation, and the measurement has gained acceptance in engineering and in law. I first presented the detailed concept in a session entitled "Software Source Code Correlation" at the peer-reviewed 5th IEEE/ACIS International Conference on Computer and Information Science. I also gave presentations at the Thirty First Asilomar Microcomputer Workshop, Silicon Valley Code Camp, the High Technology Crime Investigation Association, and at the peer-reviewed Third International Workshop on Systematic Approaches to Digital Forensic Engineering. I have published articles on the topic in the law magazine "Intellectual Property Today" and have given lectures on the topic at the Stanford

University Law School and the NALSAR University of Law in Hyderabad, India. I published articles on the topic in the engineering magazines including "Dr. Dobb's Journal" and "Software Test & Performance." I have written the first book on this subject, entitled *The Software IP Detective's Handbook: Measurement, Comparison, and Infringement Detection*. For my work in software forensics, I have been given three awards from the Institute of Electrical and Electronics Engineers: 2015 Outstanding Engineer in a Specialized Field from the IEEE Region 6 Central Area, 2015 Outstanding Engineer in a Specialized Field from the IEEE Santa Clara Valley Section, and 2010 Outstanding Engineer in a Specialized Field from the IEEE Santa Clara Valley Section. My papers and presentations about source code correlation can be found in my resume, attached as Exhibit A.

19. I have developed a product called CodeSuite® that is now distributed by a company I started called Software Analysis & Forensic Engineering, or SAFE Corporation. CodeSuite includes a function called CodeMatch® that calculates source code correlation. CodeMatch analyzes each source code file using specific algorithms and finds similarities that might otherwise be difficult to detect by manual comparison. An expert is required to examine the CodeMatch results to determine whether the source code correlations are due to copying or due to other reasons. Suite includes filtering tools that allow an expert to filter out results that are not important or relevant. The process of running CodeMatch, examining the results, and filtering out those results that are not relevant is a form of the process known in legal terms as the "abstraction-filtration-comparison test."

20. Zeidman Consulting has successfully used CodeSuite in over 110 lawsuits to date. In about half of those cases, CodeSuite was used by the defendant. In about half of those cases, CodeSuite was used by the plaintiff. In several cases CodeSuite was used by both parties. I have testified about CodeSuite, and the results generated by CodeSuite, multiple times at depositions and in court as described in my resume in Exhibit A. CodeSuite has also been licensed to other experts and used in other cases, the details of which I am unaware. The technology of CodeSuite is covered by several US patents.

21. Note that finding a correlation between different programs does not necessarily imply that unauthorized copying occurred. There can be correlations between programs for a number of reasons as enumerated below. It is important that copying is only determined to have occurred if the correlations cannot be explained by the other five reasons. Correlation due to any of the first five reasons must be filtered out of the results; then only if any correlations remain can it be determined that copying occurred.

- **Third party source code.** It is possible that widely available open-source code is used in both programs. Also, libraries of source code can be purchased from third-party vendors. If two different programs use this same code, the programs will have correlation.
- **Code generation tools.** Automatic code generation tools generate software source code using similar or identical identifiers for variables, classes, methods, and properties. Also, the structure of the code generated by these tools tends to fit into a certain template with an identifiable pattern. Two different programs that were developed using the same code generation tool will have correlation.
- **Common code elements.** Certain code elements, including identifier names, statements, and comments, are commonly taught in schools, or commonly used by programmers in certain industries. For example, the identifier `index` is often used as the name of a counting variable. These identifiers will be found in many unrelated programs but will result in these programs having correlation.
- **Common algorithms.** An algorithm is a procedure or a set of instructions for accomplishing some task. In one programming language there may be an easy or well-understood way of writing a particular algorithm that most programmers use. For example, there might be a way to calculate the square root of a number. Perhaps this algorithm is taught in most programming classes at universities or is found in a popular programming textbook. These commonly used algorithms will

show up in many different programs, resulting in a high degree of correlation between the programs even though the programs are different and there was no direct contact between the programmers.

- **Common author.** It is possible that one programmer, or "author," will create two programs that have correlation simply because that programmer tends to write code in a certain way. This is the programmer's style of coding. Thus two programs written by the same programmer can have high correlation due to the style being similar even though there was no copying and the functionality of the programs is different.
- **Copying.** Code was copied from one program to another causing the programs to have correlation. If authority was not given to copy the code, this constitutes plagiarism.

## C. CodeMatch

22. The CodeMatch® function of CodeSuite® calculates source code correlation by using a combination of four algorithms to find copying: Statement Matching, Comment Matching, Identifier Matching, and Instruction Sequence Matching. Each algorithm is useful in finding different clues to copying that the other algorithms may miss. By using all five algorithms, the chance of missing plagiarized code is significantly diminished.

### 1. *Statement matching*

23. The CodeMatch Statement Matching algorithm compares each functional line of source code from both files, excluding comment lines. Also, all whitespace is removed. For source lines to be considered matches, they must contain at least one non-keyword such as a variable name or function name. Otherwise, lines containing basic operations would be reported as matching. This algorithm yields a correlation score representing the number of matching instruction lines in the two files.

### 2. *Comment/string matching*

24. The CodeMatch Comment/String Matching algorithm compares each line of comments and strings from both files. Sequences of whitespace are converted to single spaces so that the syntax structure of the line is preserved. The entire comment is compared, regardless of whether or not there are keywords in the comment or string. This algorithm yields a correlation score representing the number of matching comments and strings in the two files.

### 3. *Identifier matching*

25. For each file pair, the CodeMatch Identifier Matching algorithm counts the number of matching identifiers that are not programming language keywords. In order to determine whether an identifier is a programming language keyword, comparison is done with a list of programming language keywords. Only non-keywords are compared in order to find matching function names, variable names, and other identifiers. This algorithm also examines each non-keyword identifier in the source code of one file and finds all identifiers that match a sequence within one or more non-keyword identifiers in the other file. For example, if identifier `abc` is found in one file and the identifiers `aabc`, `abc1111111`, and `abcxxxyz` are found in another file, then there is a partial match for the identifier `abc`. Partial matching finds common function names, variable names, and other identifiers where someone may have attempted to disguise the identifiers in a fairly basic way. This algorithm yields a correlation score representing the number of matching and partially matching identifiers in the two files.

### 4. *Instruction sequence matching*

26. The CodeMatch Instruction Sequence Matching algorithm compares the first instruction of every source line in the pair of files, ignoring blank lines and comment lines. This algorithm finds sequences of code that appear to perform the same functions despite differences in comments and identifier names. The algorithm finds the longest common sequence within both files. This algorithm yields a correlation score representing the number of source lines in the

longest matching instruction sequences in the two files.

### 5. *Correlation score*

27. Finally, a single correlation score is given for the similarity of the file pairs. If a file pair has a higher score, it implies that these files are more similar and may be plagiarized from each other or from a common third file. There are many kinds of copying and many ways of thwarting attempts to detect copying. For this reason, CodeMatch produces an HTML output report with a list of file pairs ordered by their total match scores. The user can click on a file pair hyperlink to bring up a detailed HTML report showing exact matches that occurred between the selected file pairs. In this way, experts are directed to suspicious similarities and allowed to make their own judgments. CodeMatch is not a tool for precisely pinpointing plagiarized code, but rather a tool to assist an expert in locating correlated code that may be plagiarized. CodeMatch reduces the effort needed by the expert by allowing him to narrow his focus from hundreds of thousands of lines of code in hundreds of files to dozens of lines of code in dozens of files.

## D. SourceDetective

The SourceDetective® function of CodeSuite® automatically counts the number of times each identifier, comment, string, and statement can be found on the Internet (referred to as "hits") as determined by the Microsoft Bing search engine. These hits can be used to filter the correlation results of the CodeMatch® or BitMatch® functions of CodeSuite. This is important to determine whether the code correlation measured by these two functions are due to copying or to one of the other reasons for correlation: third party code, code generation tools, common code elements, common algorithms, or common author. If matching code elements in the code of two different programs are found extensively on the Internet, they can be explained by one of these reasons. However, if matching code elements are not found on the Internet, or rarely found on the Internet, then they are more likely to be explained only by copying from one program to the other.

## IV. LEGAL BACKGROUND

28. This section describes the legal issues in this case.

### A. Copyright

29. The World Intellectual Property Organization (WIPO) defines a copyright simply as follows[1]:

> Copyright is a legal term describing rights given to creators for their literary and artistic works (including computer software).

30. In the United States, according to Circular 1, Copyright Basics, published by the U.S. Copyright Office[2], the definition of, and protections given to, copyrighted works are described as follows:

> Copyright is a form of protection provided by the laws of the United States (title 17, U. S. Code) to the authors of "original works of authorship," including literary, dramatic, musical, artistic, and certain other intellectual works. This protection is available to both published and unpublished works. Section 106 of the 1976 Copyright Act generally gives the owner of copyright the exclusive right to do and to authorize others to do the following:
>
> a) To reproduce the work in copies or phonorecords;
> b) To prepare derivative works based upon the work;
> c) To distribute copies or phonorecords of the work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
> d) To perform the work publicly, in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works;
> e) To display the work publicly, in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work; and
> f) In the case of sound recordings, to perform the work publicly by means of a digital audio transmission.

31. Further, copyright does not extend to any idea, procedure, process, system, method of

---

[1] World Intellectual Property Organization, Copyright, http://www.wipo.int/copyright/en.

[2] U.S. Copyright Office Circular 1, Copyright Basics, https://www.copyright.gov/circs/circ01.pdf

operation, concept, principle, or discovery[3], or to algorithms, formatting, functions, logic, or system design.[4]

32. The Computer Software Copyright Act of 1980 specifically spelled out the submission requirements for software, allowing "redacted" or "blocked out" copies of only small sections of code to be deposited with the Copyright Office, fully addressing concerns about disclosing trade secrets in a software copyright registration. Copyright protection is given to the source code, assembly code (which is considered to be a form of source code), and to object code.

## V. SCOPE OF REPORT

33. Based on my background and experience, I have been asked by the law firms of Sheppard, Mullin, Richter & Hampton LLP and Crowell & Moring LLP, on behalf of BTIG, LLC ("BTIG") and StoneX Group Inc. ("StoneX") (together, the "Parties") to provide my opinions and conclusions related to whether all or parts of the software source code from BTIG, LLC. ("BTIG code") were copied to the software source code from StoneX Group Inc. ("StoneX Tampa code").

34. I am abiding by the Agreement on Procedures for Forensic Source Code Analysis ("Procedures Agreement") signed on June 14, 2023 by BTIG and on June 13, 2023 by StoneX.

35. The exhibits to this report include two CodeSuite databases that resulted from the code comparisons and a number of side-by-side comparisons of code. The Parties have jointly agreed that I can provide both parties with these exhibits.

## VI. SUMMARY

36. I used the CodeSuite tool that I developed and the process I have developed to detect

---

[3] U.S. Copyright Office, Circular 33, Works Not Protected by Copyright, https://www.copyright.gov/circs/circ33.pdf.

[4] U.S. Copyright Office Circular 61, https://www.copyright.gov/circs/circ61.pdf

indications of copying and found indications that some Tampa code was directly copied from BTIG code.

37. The document "StoneX Self-Identified Potential Sources of Code Overlap and Related Issues" purports to offer explanations from StoneX for the correlations appearing in both parties' code, but these explanations refer to common mathematical formulas or publicly available references without addressing the issue of literal code copying where there are lines of code including long sections of identical code and identical files.

38. On July 31, 2023, I received a letter from Vincent Galluzzo of Crowell & Moring LLP ("Crowell Letter") representing StoneX. As I explain in Section VII.D below, the letter has not changed my overall opinion.

## VII. ANALYSIS

39. In this section I describe the analysis that leads to my conclusions.

### A. Source Code Analysis

40. In reviewing BTIG code and StoneX Tampa code, I found that both parties' code was written in the C++ programming language. I used the CodeSuite program and the process described below to compare the code to look for indications of copying. My tools and techniques have been successfully used on behalf of plaintiffs and defendants in over 110 cases to date and were accepted by the court each time. I have also trained over 50 engineers worldwide in the tools and techniques. A zip file containing the CodeSuite databases of results from the analyses is included as Exhibit B.

### B. CodeSuite Results

41. I utilized my standard iterative step-by-step method to evaluate the correlations identified by CodeMatch. The steps of this filtering process are summarized in Figure 1.




**Figure 1. Correlation filtering method**

**1.** ***Third party source code?***

42. In order to determine whether any of the correlations could be attributed to third-party source code, I looked for copyright notices or references to third parties within the code. I also used SourceDetective to search the Internet for references to the statements, comments, strings, and identifiers that were found. SourceDetective tests each code element that has been identified as matching in both files against the entire Internet. If these code elements can be found in third-party code, SourceDetective found references to them, and I then filtered these code elements out of the results. I did not find correlations attributable to third-party code.

43. These tests allowed me to eliminate correlations that were the result of using third-party code. The correlations that remained were not due to code from third-party sources.

**2.** ***Code generation tools?***

44. To further determine whether any of the correlations could have been attributed to code generation tools, I looked for specific comments and identifiers within the code. Code generation tools typically insert comments into the code being generated to identify the code generation tool and the tool version. Code generation tools also have very specific identifier

naming conventions that are recognizable. I found no such correlated elements indicating code generation tools.

45. These tests allowed me to eliminate correlations that were the result of using code generation tools that I had not already filtered out using the SourceDetective results. The correlations that remained were not the result of code generation tools.

### 3. *Common code elements?*

46. In order to determine whether any of the correlations could have been attributed to common code elements, such as common identifier names, statements, and comments, I looked for code elements that I have come across in my own experience as a software developer. SourceDetective is efficient at finding code elements that appear often on the Internet, and I also used this information to filter out the common code elements. I filtered out common code elements such as the identifiers in Table 7, statements in Table 8, and comments and strings in Table 9 that are found in both BTIG code and StoneX Tampa code.

[redacted]

**Table 7.** [redacted]

[redacted]

**Table 8.** [redacted]

[redacted]

**Table 9.** [redacted]

47. This test allowed me to eliminate correlations that were the result of common code elements. The correlations that remained were not due to common code elements.

**4. *Common algorithms?***

48. In determining whether the algorithms described in the source code are common ones, I searched the Internet using SourceDetective and also relied on my years of experience and extensive knowledge of programming. I found no such common algorithms.

49. This test allowed me to eliminate correlations that were the result of common algorithms. The correlations that remained were not due to common algorithms.

**5. *Common author?***

50. A common author can be a reasonable explanation for some correlated identifiers, strings, comments, or coding styles. For instance, developers may have a particular coding notation that they use to create identifier names. There are several well-known notations, such as Hungarian and Camel notation, that developers use to make identifier names more descriptive. A

particular developer is more likely to use the same notation and therefore create the same or similar identifier names in two independently developed programs. A particular author may also write comments and strings in a particular way, using certain unusual words or unusual spellings. I found no such correlation due to common authors.

51. This test allowed me to eliminate correlations that were the result of common authors that I had not already filtered out using the SourceDetective results. The correlations that remained were not due to common authors.

#### 6. *Copying*

52. When all of the other reasons for the correlations between the BTIG code and the StoneX Tampa code were eliminated, correlation remained. After filtering out correlations caused by the explanations discussed above and summarized in Figure 1, the only reasonable explanation for the remaining correlations is that code was copied. Exhibit C through Exhibit OO show side-by-side examples of 39 file pairs from BTIG and StoneX that have substantial sections of files that are line-by-line identical.

### C. StoneX Self-Identified Code Analysis

53. Before starting my comparison, StoneX provided me with a document entitled "StoneX Self-Identified Potential Sources of Code Overlap and Related Issues" that gave information allegedly explaining correlations that I might find in the code between the two Parties. I used this document as a possible source of correlation due to reasons other than copying, but I found that it did not explain the correlations, for the reasons I give below.

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

**Table 10.** [redacted]

61. Most of the Internet resources referenced by the StoneX document are simply mathematical formulas found in Wikipedia and textbooks. Where StoneX has identified actual code references, I did not find correlations in those files due to copying. However, for other files, such as the code correlations for the StoneX Tampa files [redacted] and [redacted] seen in Exhibit C, Exhibit D, Exhibit MM, and Exhibit NN, these files are substantially identical with the corresponding BTIG code files, and these indicators of copying are not explained by the mathematical formulas in the Wikipedia pages referenced by StoneX.

**D. Response to Letter From Crowell and Moring After My Preliminary Report**

62. On July 31, 2023, I received the Crowell Letter representing StoneX. I will address the points raised in that letter here.

**1. *The Initial Report Does Assume that BTIG's Source Code Is "Copyrighted"***

63. It was my understanding that BTIG had a registered copyright in the code during one of the phone discussions. It may be that I misheard or misunderstood this fact, so I have taken out references to BTIG copyrighted code in this final version of my report. This change does not change my findings or my conclusions.

**2. *The Initial Report Does Not Rely Too Heavily on My Use of CodeMatch, Rather Than My Own Independent Judgment And Analysis***

64. This report details the standard process for detecting copying of code that relies on all of the tools of CodeSuite, not just the CodeMatch function. It also relies on the process for filtering results and my judgment in evaluating the results, all of which are explained in detail in this report and the accompanying exhibits. This complaint is incorrect and does not change my findings or my conclusions.

**3. *The Initial Report Does Not Overstate What CodeMatch Does***

65. The Crowell Letter states:

> CodeMatch does not filter out information that legally is precluded from copyright protection, such as "any idea, procedure, process, system, method of operation, concept, principle, or discovery" or "algorithms, formatting, functions, logic, or system design," all of which the Initial Report's "Legal Background" section concedes cannot be protected by copyright. (Initial Report at 13-14). Thus, CodeMatch is incomplete at least as to the "filtration" step, in which a rigorous analysis must remove non-copyright-protectable elements of code before comparing that code to other code.

Crowell letter, p. 2.

66. This is a misunderstanding of copyright law. The legal definition describes things that are not protected by copyright. However, within an expression that is protectible by copyright, such as software source code, there are things that cannot be protected because while they fit into the category of protectible expression, they cannot be copyrightable by either party. For example, neither BTIG nor StoneX can claim a copyright in previously copyrighted third-party code that both parties incorporated into their own code.

67. This is also a misunderstanding of the process that I use, though I explained it in detail above. My process favors false negatives in that it eliminates code elements from consideration when they are correlated between the two parties' source code but when there is a reasonable explanation other than copying.

68. CodeSuite and my process for detecting software copying has been used in over 115 software copyright cases worldwide, and the results, whether showing copying or showing no copying, have survived every legal challenge.

69. This assertion is incorrect and does not change my findings or my conclusions.

#### 4. *The Initial Report's Correlation/Copying Analysis Is Complete and Not Faulty*

70. First, the Crowell Letter on page 3 asserts that Exhibit FF is in error and should be ignored. As the Crowell Letter further notes, this is a legitimate file comparison in portrait layout that was replaced during drafting of the report with a more informative landscape layout, and the

exhibits were then renumbered. This old exhibit was included in error and can be ignored, but it does not change my findings or my conclusions.

71. The Crowell Letter further states on page 3 that "the Initial Report dramatically overstates the amount of code correlation because almost half of the Initial Report's 39 exhibits are duplicates of each other. Fourteen of the Initial Report's exhibits use seemingly identical files from BTIG's code found in two different locations… Similarly, the Initial Report's exhibits contain multiple, overlapping comparisons of the same StoneX code…"

72. I was not asked to differentiate versions of code, and if either party supplied duplicates of their code, that is not my concern in this matter. Further, code may be cut from one file and pasted into another file, which would create correlations between multiple files from both parties. My task was not to identify the amount of copying, or which versions of files showed indications of copying, but simply to determine whether copying occurred. This observation does not affect my findings or my conclusions.

#### 5. *Third-Party Information and Code from a Third-Party Source*

73. This lengthy section of the Crowell Letter from pages 4 through 7 attempts to explain literally identical lines of unique source code and source code sequences in both parties' source code as somehow deriving from articles, websites, mathematical formulas, and completely different source code that performs the same or similar functions as those I identified as copied. This is like saying that two authors who wish to modernize Shakespeare's *Romeo and Juliet* might both independently write *West Side Story* with long passages of identical wording. It is just not a reasonable conclusion.

74. If the code correlations could be explained by third-party code used by both parties, StoneX has had ample time to find such third-party code and show a side-by-side-by-side comparison of lines of code to confirm this common origin. StoneX has not done that. Therefore, the assertions in this section are unconvincing and do not affect my findings or my conclusions.

#### 6. *Correlation Due to Common Author*

75. The Crowell Letter asserts on page 7 that code at BTIG and at StoneX was written by Mr. Evan Pfeuffer and thus the correlations are explained as due to a common author. I explained above how a common author analysis can be used to identify unique idiosyncrasies in the code that are due to having a common author. However, identical long sections of lines of code, as I found matching in the BTIG and StoneX source code, cannot be explained by a common author. This observation does not affect my findings or my conclusions.

#### 7. *Other Indicators of Copying*

76. First, the Crowell Letter states on page 8 that the testimony of Mr. Shipman was incorrect and that FlexTrade was StoneX's first internal customer. This means that there is a logical reason for FlexTrade to be mentioned in StoneX's code other than copying. Given that there is a disagreement about this issue, I cannot conclude anything at this time about the mention of FlexTrade in StoneX code, but I left in the paragraph above, with a disclaimer, in case the veracity of Mr. Shipman's assertion is determined one way or another in the future.

77. Second, the Crowell Letter further states on page 8 that "the references to 'BTIG' and 'MATT_FITZPATRICK' in StoneX's code are essentially errata in the code in that they are not utilized in StoneX's market-making application at all."

78. I do not understand this explanation why BTIG's name and that of an executive at BTIG would appear in this code other than that the code was copied by StoneX from BTIG. Simply calling it "an errata" and asserting that the code is not used, without evidence, does not affect my findings or my conclusions.

79. Third, the Crowell Letter asserts that BTIG does not have a relationship with FlexTrade and therefore this indicates that the code originated with StoneX, not BTIG. Given that I have no evidence whether either company had a relationship with FlexTrade, as the Crowell Letter has pointed out, I cannot draw a conclusion about which company's code has a legitimate reason for including the name of FlexTrade in it, and thus this assertion does not affect

my findings or my conclusions.

#### 8. *Other Comparisons of Code Do Not Fail to Show Correlation*

80. The Crowell Letter asserts on page 8 that some of the exhibits in this report "show very poor correlation." This is a misunderstanding of correlation and the filtering process. Just as a finger comprises a small percentage of a person's entire body, a fingerprint can put a suspect at the scene of a crime. Similarly, as explained above, even a small amount of correlation that cannot be explained other than by copying represents conclusively that copying occurred. This assertion does not affect my findings or my conclusions.

#### 9. *The Correlated Code Is Copyrightable*

81. The Crowell Letter at page 9 asserts that the correlated code that I found to be copied is not copyrightable because it comprises simply "basic utility code" that "contains no business logic" and thus "cannot be protected by copyright." This is a fundamental misunderstanding of copyright, particularly as it applies to software. As recently as 2021, in *Google LLC v. Oracle America, Inc., 141 S. Ct. 1183 (2021)*, the Supreme Court confirmed that even application program interfaces ("APIs"), which are simply small lines oof code performing utilitarian functions to connect disparate programs are protected by copyright[5]. This assertion does not affect my findings or my conclusions.

#### 10. *StoneX Asserts That Much of the Correlated Code Is Not Used, But Represented It to Me As Their Code*

82. The Crowell Letter on page 9 asserts, "Of all the instances of correlated code identified in the Initial Report, only eleven files are actually used in StoneX's market-making application." However, StoneX supplied this code to me, representing it as their code, and have

---

[5] The Supreme Court also confirmed that copying such APIs may be fair use if they are done for the public good, but the fair use defense was not brought up in the Crowell Letter, and I have no information that it would be applicable here.

not produced any evidence that any of it is not in use. Furthermore, copyright infringement is not based on the amount of code copied but the substantiality of the code, which I explain further below. Therefore this assertion does not affect my findings or my conclusions.

### 11. *The Amount of Correlated Code Is Not Insubstantial*

83. The Crowell Letter on page 9 asserts that I have only identified a small percentage of code that is copied and thus any copying is insubstantial. This shows a misunderstanding of my process and of copyright law, particularly as it pertains to software.

84. My process identifies code that is correlated between the code of two parties that cannot be explained in any way other than copying. My process errs on the side of false negatives in that it eliminates any correlations that may be due to copying but can reasonably be explained by other reasons. Therefore, the lines of code that I identify may not be all the code that was copied.

85. Further, substantiality of copying is not measured by percentages, but rather by the criticality of the code that was copied. Copying a small section of text from a large encyclopedia may be copyright infringement. Copying only the introductory chapter of a novel may be copyright infringement. Copying only a small section of code from a program is almost always copyright infringement because software code will fail if even one character of functional code is changed, meaning that nearly all code is critical to an application. Code is copied because it is complete, tested, fully functional, and is already known to work within a similar program, saving the copier time to develop the functionality, test the functionality, and integrate it into the application. In this way, most, if not all, copied code is substantial under copyright law. Therefore this assertion does not affect my findings or my conclusions.

### 12. *In Regard to BTIG's Market-Making Code*

86. The Crowell Letter asserts on page 10 that my report "definitively refutes Mr. Shipman's allegation that StoneX's market-making code was stolen from BTIG." I was never

tasked with understanding or identifying the functionality of the code that I received and therefore, I can make no such conclusion one way or the other. All code in a program must be integrated into a fully functioning application. If any code was copied, this copied code affects the functionality of all other code in the application, either directly or indirectly. Because I was not asked to examine the functionality of the code, I cannot draw any conclusion about whether market-making code was copied, and I do not want either party to assume that I have drawn such a conclusion one way or another.

## E. Conclusion

87. Based on my extensive analysis performed by comparing BTIG code files to StoneX Tampa code, it is my conclusion that StoneX copied code from BTIG. Even considering the explanations provided by StoneX for potential code overlap, the identical lines of code, sections of code, and entire files are nowhere to be found in the public domain. Further, the letter from Crowell & Moring dated July 31, 2023 has not changed my opinion.

Dated: August 1, 2023

Robert Zeidman

**Exhibit A: Resume of Robert Zeidman**

**Exhibit B: CodeSuite Databases**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]